Thomas M. Biesty
NY Bar No. 4172896; (202) 326-3043; tbiesty@ftc.gov
Laura C. Basford
DC Bar No. 993645; (202) 326-2343; lbasford@ftc.gov
J. Ronald Brooke, Jr.
MD Bar No. 0202280002; (202) 326-3484; jbrooke@ftc.gov
Joshua A. Doan
DC Bar No. 490879; (202) 326-3187; jdoan@ftc.gov
600 Pennsylvania Ave., NW, CC-6316
Washington, DC 20580
Attorneys for Plaintiff Federal Trade Commission

Aaron D. Ford, Attorney General
Ernest D. Figueroa, Consumer Advocate
Lucas J. Tucker
NV Bar No. 10252; (702) 486-3256; ltucker@ag.nv.gov
Samantha B. Feeley
NV Bar No. 14034; (702) 486-3789; sfeeley@ag.nv.gov
State of Nevada, Office of the Attorney General
Bureau of Consumer Protection
8945 W. Russell Road, #204
Las Vegas, NV 89148
Attorneys for Plaintiff State of Nevada

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, and<br><br>**STATE OF NEVADA**,<br><br>        Plaintiffs,<br><br>    v.<br><br>**INTERNATIONAL MARKETS LIVE, INC**., et al.,<br><br>        Defendants. | **Case No. 2:25-cv-00760-CDS-NJK**<br><br><br>**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ........................................................................................................... 1

**STATEMENT OF FACTS**............................................................................................ 3

   I. **Defendants' Deceptive Business Practices** ......................................................... 3

      A.   IML's Advertising ............................................................................................ 3

      B.   IML's Business Model Layers Deception on Deception............................. 9

      C.   Defendants' Deceptive Telemarketing ...................................................... 10

      D.   The ROSCA Defendants Fail to Disclose Material Terms to Online Purchasers And Fail to Obtain Their Express Consent............................................................. 13

      E.   IML Controls Its Salespeople and Consumers Understand IML's Salespeople are Representatives of The Company ........................................................................ 15

      F.   Defendants Attempt to Hide Behind a Compliance Program They Actively Undermine to Further Their Salespeople's Deception....................................... 17

      i.   Defendants Knowingly Subvert IML's Compliance Programs .............................. 18

      G.   Defendants' Disdain for Law Enforcement .............................................. 24

   II. **IML Has No Basis for Claiming Purchasers Will Likely Make Money** .................. 26

      A.   Most Purchasers Lose Money Using Defendants' Training Services ...................... 26

      B.   Most Participants in Defendants' Business Venture Make Little or No Income, and Many Lose Money ........................................................................................ 29

   III. **The Defendants** ........................................................................................... 31

      A.   Corporate Defendants ........................................................................... 31

      B.   Individual Defendants ........................................................................... 33

   IV. **Consumer Injury** ........................................................................................ 40

**ARGUMENT**.............................................................................................................. 40

   I. **The FTC Act and the Nevada Revised Statutes Authorize the Requested Relief** ...... 40

i

II. **The Proposed Preliminary Injunction Order is Appropriate and Necessary**........... 43

    A.   Plaintiffs Are Likely to Succeed on the Merits......................................... 43

    B.   The Equities Weigh in The Public's Favor............................................... 54

    C.   The Proposed Injunctive Relief is Appropriate ..................................... 54

**CONCLUSION** ........................................................................................................ 58

**Appendix A: Selected Top IML Salespeople's Earnings Claim Violations**.......................... 60

## <u>TABLE OF AUTHORITIES</u>

<u>Statutes</u>

15 U.S.C. § 45(a) ......................................................................................................2, 43

15 U.S.C. § 57a ...............................................................................................................41

15 U.S.C. § 57b(b) ..........................................................................................................41

15 U.S.C. §§ 6101-6108 ...................................................................................................2

15 U.S.C. §§ 8401 *et seq.*................................................................................................2

15 U.S.C. § 8403 ......................................................................................2, 13, 48, 51

15 U.S.C. § 8404(a) .........................................................................................................41

Nev. Rev. Stat. § 0.039 ...................................................................................................50

Nev. Rev. Stat. § 598.0915(5) .........................................................................................50

Nev. Rev. Stat. § 598.0923(1)(c) ....................................................................................51

Nev. Rev. Stat. § 598.0937 ..............................................................................................50

Nev. Rev. Stat. § 598.094 ...............................................................................................50

Nev. Rev. Stat. § 598.0963 ..............................................................................................42

<u>Regulations</u>

16 C.F.R. § 310.2(s) ........................................................................................................47

16 C.F.R. § 310.2(w) ...............................................................................................13, 48-49

16 C.F.R. § 310.2(ee) ......................................................................................................47

16 C.F.R. § 310.2(hh) ......................................................................................................47

16 C.F.R. § 310.2(ii) ........................................................................................................47

16 C.F.R. § 310.3(a)(2)(iii) ..............................................................................................47

16 C.F.R. § 310.3(a)(2)(vi) ..............................................................................................47

16 C.F.R. § 310.3(a)(4) ....................................................................................................47

16 C.F.R. § 310.6(b)(5)(i) ................................................................................................48

iii

Cases

*AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67 (2021) ....................................................41

*Barrer v. Chase Bank United States, N.A.*, 566 F.3d 883 (9th Cir. 2009) .......................49

*Betsinger v. D.R. Horton, Inc.*, 126 Nev. 162 (Nev. 2010) ..........................................50

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)...................... 2, 40-42, 54

*FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297 (W.D. Wash. 2024)…………………..49

*FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) ...............................2, 41

*FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080 (C.D. Cal. 1994).........................52

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989).............................................52

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) .......................35

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) ............................35, 40, 53

*FTC v. Consumer Def., LLC*, 926 F.3d 1208 (9th Cir. 2019).............................................42

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006)...................................44, 46

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ....................................43

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) ......................................................43-44

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000).........................44

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ........................................................................43

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ..............................35

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) .........................................51

*FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-RFB-GWF, 2015 WL 2130504

    (D. Nev. May 6, 2015)................................................................................................49

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ..............................51-52

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012)...........52

*FTC v. Johnson*, 156 F. Supp. 3d 1202 (D. Nev. 2015) .......................................44-45, 51

*FTC v. Lights of America, Inc.*, No. 8:10-CV-1333, 2013 WL 5230681 (C.D. Cal. Sept. 17,

2013) ........................................................................................ 43-44, 53

*FTC v. Neora LLC,* Civil Action No. 3:20-cv-01979-M, 2023 WL 8446166 (N.D. Tex. Sept. 28,

    2023) ...................................................................................................45

*FTC v. Neora LLC,* No. 3:20-cv-01979-M, 2024 WL 3414347

    (N.D. Tex. May 29, 2024) ....................................................................45

*FTC v. Network Servs. Depot, Inc.,* 617 F.3d 1127 (9th Cir. 2010) ........................... 51-53

*FTC v. Nudge, LLC,* 430 F. Supp. 3d 1230 (D. Utah 2019) ...............................47

*FTC v. Pantron I Corp.,* 33 F.3d 1088 (9th Cir. 1994)........................................ 40, 43-44

*FTC v. Publ'g Clearing House,* 104 F.3d 1168 (9th Cir. 1997).........................52

*FTC v. Simple Health Plans LLC,* 58 F.4th 1322 (11th Cir. 2023) ...................41

*FTC v. Stefanchik,* 559 F.3d 924 (9th Cir. 2009)........................................ 43-45, 48

*FTC v. Vemma Nutrition Co.,* No. 2:15-CV-1578, 2015 WL 11118111

    (D. Ariz. Sept. 18, 2015) ....................................................................44

*FTC v. Warner Communications Inc.,* 742 F.2d 1156 (9th Cir. 1984).........................42

*FTC v. World Wide Factors, Ltd.,* 882 F.2d 344 (9th Cir. 1989) ......................... 42-43, 54

*Goodman v. FTC,* 244 F.2d 584 (9th Cir. 1957)........................................44

*In re Cliffdale Assocs.,* 103 F.T.C. 110, 1984 WL 565319 (F.T.C. 1984) ......................44

*In re Sw. Sunsites, Inc.,* 105 F.T.C. 7, 1985 WL 668880 ...................................44

*Johnson v. Couturier,* 572 F.3d 1067 (9th Cir. 2009)........................................55

*Poole v. Nev. Auto Dealership Invs., LLC,* 135 Nev. 280

    (Nev. Ct. App. 2019)..........................................................................50

*Tri-State Generation & Trans. Ass'n., Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351 (10th

    Cir. 1986) ...........................................................................................42

*United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172

    (9th Cir. 1987)............................................................................ 42-43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### INDEX OF EXHIBITS

| Exhibit | Description | Bates Range |
|---------|-------------|-------------|
| PX 1 | Declaration of Briana Elias Williams, Consumer | 1 – 107 |
| PX 2 | Declaration of Leandro David Ramos, Consumer | 108 – 112 |
| PX 3 | Declaration of Matthew Meeker, Consumer | 113 – 115 |
| PX 4 | Declaration of Ryan Gonzalez, Consumer and Former IML Salesperson | 116 – 149 |
| PX 5 | Declaration of Alex Drew Porter, Consumer | 150 – 151 |
| PX 6 | Declaration of Anthony Dusold, Consumer | 152 – 164 |
| PX 7 | Declaration of Carlos Vasquez, Consumer | 165 – 166 |
| PX 8 | Declaration of Elleni Skouloudis, Consumer | 167 – 171 |
| PX 9 | Declaration of Fabella Decema, Consumer and Former IML Salesperson | 172 – 175 |
| PX 10 | Declaration of Justin Smith, Consumer | 176 – 184 |
| PX 11 | Declaration of Jacob Rose, Consumer | 185 – 259 |
| PX 12 | Supplemental Declaration of Jacob Rose, Consumer and Former IML Salesperson | 260 – 295 |
| PX 13 | Declaration of Christian Salinas, Consumer | 296 – 297 |
| PX 14 | Declaration of Luke Neumann, Consumer and Former IML Salesperson | 298 – 306 |
| PX 15 | Declaration of Mariano Levaggi, Consumer and Former IML Salesperson | 307 – 310 |
| PX 16 | Expert Report of Dr. Bruce Isaacson | 311 – 873 |
| PX 17 | Declaration of Bonnie Patten, Truth in Advertising | 874  – 1246 |
| PX 18 | Second Declaration of Bonnie Patten, Truth in Advertising | 1247 – 1469 |
| PX 19 | Third Declaration of Bonnie Patten, Truth in Advertising | 1470 – 1800 |
| PX 20 | Declaration of William J. Violette, FTC Economist | 1801 – 1840 |
| PX 21 | Declaration of Roshni Agarwal, FTC Forensic Accountant | 1841 – 1847 |

vi

| PX 22 | Declaration of Anne Miles, FTC Data Analyst | 1848 – 1850 |
|-------|---------------------------------------------|-------------|
| PX 23 | Declaration of Blanca Graham Cordova, FTC Investigator | 1851 – 2217 |
| PX 24 | Declaration of Reeve Tyndall, FTC Investigator (Undercover Investigation) | 2218 – 2707 |
| PX 25 | Second Declaration of Reeve Tyndall, FTC Investigator (Documents from Defendants and Third Parties) | 2708 – 6928 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

The Federal Trade Commission ("FTC") and the State of Nevada (collectively, "Plaintiffs") respectfully request that the Court put a stop to Defendants' unlawful marketing of their investment training and business scheme. The scheme has operated under the brand names iMarketsLive, IM Academy, IM Mastery Academy, and IYOVIA (collectively, "IML").

Defendants use an army of salespeople to target young adults with promises of generating substantial earnings through learning how to profitably trade in the financial markets and also through Defendants' multi-level marketing ("MLM") business venture. These promises are false and unsubstantiated. Defendants' unlawful acts have caused more than $1.242 billion in estimated worldwide consumer harm since 2018, including $535 million in harm to U.S. consumers.[1]

Defendants have continued to operate their unlawful scheme despite numerous consumer complaints, legal actions and warnings, damning press coverage, alerts from IML's internal compliance staff, and being on notice of the FTC's investigation since December 2021. Defendants knowingly profit from their and their salespeople's deceptive earnings claims and

---

[1] Plaintiffs submit over 6,900 pages of exhibits, including an expert report and declarations from consumers, former IML salespeople, an FTC economist, an FTC forensic accountant, and FTC investigators, in support of this Motion. References to exhibits appear as "PX[number], [page]." *See* Index of Exhibits, above.

On May 1, 2025, Plaintiffs filed a motion to extend the page limit for this Motion. (ECF No. 13). That motion is fully briefed as of May 20, and is unopposed by Defendants Global Dynasty Network, LLC, Jason Brown, Alex Morton, and Matthew Rosa. (ECF Nos. 27, 28, 31). Plaintiffs are filing this Motion now without awaiting a ruling on the page-limit motion due to critical recent developments. Plaintiffs understand that Defendants have recently informed consumers that IML was suspending its operations and would be deleting consumers' data held by IML. PX25, 2724, 6917 (2nd Tyndall Decl., ¶36, Att. AA). On May 22, Plaintiffs emailed counsel for Defendants International Markets Live, Inc., Assiduous, Inc., IM Mastery Academy Ltd., and Christopher and Isis Terry, and sought confirmation that those Defendants would preserve all relevant evidence. Plaintiffs have received no response. Plaintiffs have also learned that at least some of the Defendants appear to be continuing their deceptive practices at another company. PX25, 2724, 6918-28 (2nd Tyndall Decl., ¶37, Atts. BB, CC).

have furthered the scheme by—among other things—rewarding salespeople who make deceptive earnings claims, taking steps to evade law enforcement scrutiny, and directing their salespeople to do the same.

Defendants' deceptive conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310; Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403; and the Deceptive Trade provisions of Chapter 598 of the Nevada Revised Statutes.[2]

Defendants have been dissipating ill-gotten gains from the scheme by, among other things, moving funds offshore or into cryptocurrency to evade regulations and taxes, and living extravagant lifestyles. To protect consumers and preserve assets for potential consumer redress, Plaintiffs seek a preliminary injunction ("PI") that enjoins Defendants' unlawful conduct, preserves Defendants' assets, and appoints a monitor over Corporate Defendants, which have operated as a common enterprise. In numerous similar FTC actions, district courts, including in this Circuit and District, have granted such preliminary relief.[3]

---

[2] The FTC enforces ROSCA, 15 U.S.C. §§ 8401 *et seq.*, which prohibits certain methods of negative option marketing on the internet. The FTC also enforces the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108. In accordance with that Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

[3] *See, e.g.*, *FTC v. Superior Servicing, LLC*, Case No. 24-cv-2163-GMN-MDC (D. Nev. Dec. 6 and 19, 2024) (ECF Nos. 30 and 42) (PI; asset freeze against individual and corporate defendant, and receiver); *FTC v. Consumer Def., LLC*, Case No. 2:18-cv-00030-JCM-PAL (D. Nev. Feb. 20, 2018) (ECF No. 55) (same); *FTC v. RevMountain, LLC*, Case No. 2:17-cv-02000-APG-GWF (D. Nev. Sept. 1, 2017) (ECF No. 56); *FTC v. Health Formulas, LLC*, Case No. 2:14-cv-01649-RFB-GWF (D. Nev. May 6, 2015) (ECF No. 149); *FTC v. Ideal Fin. Solutions, Inc.*, Case No. 2:13-cv-00143-JAD-GWF (D. Nev. Feb. 15, 2013) (ECF No. 18); *FTC v. Ivy Capital, Inc.*, Case No. 2:11-cv-00283-JCM-GWF (D. Nev. Mar. 25, 2011) (ECF No. 91). The Ninth Circuit has affirmed such cases. *See, e.g.*, *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1232 & n.2 (9th Cir. 1999); *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1512 (9th Cir. 1987).

**STATEMENT OF FACTS**

**I. Defendants' Deceptive Business Practices**

Since at least 2018, IML has scammed consumers into spending hundreds or thousands of dollars with claims that its training products or services (collectively, "Training Services") will enable them to generate substantial earnings through trading in the financial markets. IML has also represented that participants in its MLM business venture ("Business Venture") will make substantial earnings. Those claims are false and unsubstantiated.

**A. IML's Advertising**

Defendants and their salespeople market their services through social media and telemarketing.[4] IML refers to its salespeople—participants in its Business Venture—as "independent business owners" or "IBOs." IML salespeople flood their social media accounts with posts aimed at recruiting customers for IML.[5] These posts are replete with luxurious images depicting the salesperson as a financial success; expensive cars, watches, and exotic vacations are common themes.[6] IML claims that its services allow consumers to make money even if they have little money, experience, or time. For example, on November 7, 2024, an IML salesperson

---

[4] PX25, 4778 (2nd Tyndall Decl., Att. Z) (Defendant Jason Brown May 9, 2023 Dep. Tr. at 21:08-11) (stating that IML's marketing was "referral-based, social sharing"); *id*. at 4914 (Chris Terry 2018 Witness Testimony Tr. at 131:19-132:04) (noting that in IML's advertising "[e]verything is pretty much through social media. These – they [IML's salesforce] put stuff on Facebook. They put stuff on Instagram."); PX24, 2302 (1st Tyndall Decl., Att. F) (Defendant Rosa instructed IML salespeople that he became successful by "picking up the phone, picking up the phone, picking up the phone, picking up the phone.").

[5] PX6, 152 (Dusold Decl. ¶2); PX9, 172 (Decema Decl. ¶2); PX2, 108 (Ramos Decl. ¶2). IML's higher-ranking salespeople inculcate their charges with the need to saturate their social media accounts with advertisements for IML. PX12, 260 (Rose Supp. Decl. ¶3); PX10, 176-77, 181-82 (Smith Decl. ¶5 and Att. B); PX1, 3, 45-46 (Williams Decl. ¶12 and Att. H).

[6] PX4, 116 (Gonzalez Decl. ¶3); PX7, 165 (Vasquez Decl. ¶4); PX9, 172 (Decema Decl. ¶2); PX2, 108 (Ramos Decl. ¶2); PX14, 298 (Neumann Decl. ¶¶2, 4). The extravagant use of luxury images in social media advertisements is a well-established sales tactic within IML's salesforce. PX1, 4 (Williams Decl. ¶¶16-17); PX12, 260 (Rose Supp. Decl. ¶3); PX15, 309 (Levaggi Decl. ¶12).

3

posted the following on Instagram, touting IYOVIA's "AI education and trading platform" that



allows consumers to make "money in minutes."

**Figure 1**: Screenshot of IML Salesperson's Social Media Posting.[7]

---

[7] PX24, 2246-47 (1st Tyndall Decl. ¶53). IML salespeople have also claimed that IML's trading instructors are audited by the FTC. *Id.* at 2241-42 (1st Tyndall Decl. ¶40).

The social media advertisements also purport to show highly successful trades made by IML members and tout the market prowess of IML's instructors.[8] For example, the below winning trades were posted on a private Facebook group and then shared on YouTube by an IML salesperson on March 9, 2025, with the title, "Best Scanner For Trading The Markets With Crazy Results?! SEE PROOF INSIDE."



**Figure 2**: Screenshot of IML Salesperson's Social Media Posting.[9]

These social media advertisements promising easy profits from trading using IML's Training Services often entice consumers to inquire about those services.[10] IML's salespeople also solicit consumers to buy IML's Training Services through phone calls, text messages, and

---

[8] PX5, 151 (Porter Decl. ¶7); PX11, 186 (Rose Decl. ¶9); PX8, 167 (Skouloudis Decl. ¶6).

[9] PX24, 2247-48 (1st Tyndall Decl. ¶54).

[10] PX9, 172 (Decema Decl. ¶¶2-3); PX6, 152 (Dusold Decl. ¶2); PX2, 108 (Ramos Decl. ¶¶2-3).

5

direct messages on social media.[11] During the initial direct consumer contacts, IML salespeople emphasize the purported wealth that consumers will or are likely to earn from deploying the knowledge learned from IML's Training Services; beyond earnings claims, little detail about the training is provided.[12] The IML salesperson then typically invites consumers to meet with the salesperson's "mentor" at IML.[13]

These mentor meetings can range from a one-on-one telephone call between the mentor and consumer to mass meetings (dubbed "opportunity calls") conducted by video conference (e.g., Zoom) that include scores of potential purchasers.[14] Like the initial exchanges between the consumer and salesperson, the mentors routinely represent that consumers will or are likely to make significant income by learning from IML how to trade in the financial markets; images of purported IML members' profitable trades and luxurious lifestyles are often featured on the opportunity calls.[15] Purchasers of Training Services have paid IML between over $100 to nearly $500 to sign up.[16] Thereafter, IML automatically renews consumers' memberships every four weeks, charging between slightly less than $100 to nearly $400, unless or until the consumer cancels the auto-renewal.[17]

---

[11] PX6, 152 (Dusold Decl. ¶¶2-3); PX2, 108 (Ramos Decl. ¶3); PX11, 185 (Rose Decl. ¶2); PX8, 167 (Skouloudis Decl. ¶2); PX7, 165 (Vasquez Decl. ¶2); PX1, 1 (Williams Decl. ¶2); PX13, 296 (Salinas Decl. ¶2).

[12] PX6, 152-53, 164 (Dusold Decl. ¶¶3, 9, Att. C); PX11, 185 (Rose Decl. ¶2); PX8, 167 (Skouloudis Decl. ¶2); PX7, 165 (Vasquez Decl. ¶2).

[13] PX6, 152 (Dusold Decl. ¶3); PX4,116 (Gonzalez Decl. ¶4); PX2, 108 (Ramos Decl. ¶3); PX11, 185 (Rose Decl. ¶2); PX8, 167 (Skouloudis Decl. ¶3); PX7, 165 (Vasquez Decl. ¶2).

[14] PX4,116 (Gonzalez Decl. ¶4); PX11, 185 (Rose Decl. ¶¶2-3); PX1, 1-2 (Williams Decl. ¶¶2-5); PX9, 172 (Decema Decl. ¶4); PX13, 296 (Salinas Decl. ¶3).

[15] PX6, 152 (Dusold Decl. ¶4); PX4,116 (Gonzalez Decl. ¶4); PX2, 108 (Ramos Decl. ¶3); PX11, 185 (Rose Decl. ¶3); PX8, 167 (Skouloudis Decl. ¶3); PX7, 165 (Vasquez Decl. ¶2); PX1, 1-2 (Williams Decl. ¶5); PX15, 307 (Levaggi Decl. ¶4).

[16] *See* PX25, 4614-16 (2nd Tyndall Decl., Att. X) (IML Interrogatory No. 9 Resp.).

[17] *Id.*

Plaintiffs retained Dr. Bruce Isaacson,[18] who conducted an online survey in 2024 of consumers who had, since January 1, 2020, purchased IML's Training Services, and individuals who had participated in the Business Venture since January 1, 2020 ("Isaacson Survey").[19] Over 75% of the 653 consumers who completed the survey indicated that IML or its representatives said or suggested that the Training Services would provide the ability to make substantial money from trading.[20] And over 56% of those consumers also indicated that IML or its representatives said or suggested that the Training Services would provide the ability to make substantial money from trading with little time or effort.[21]

Defendants focus their marketing on young people, many of whom are Black and Latino.[22] For example, a January 2023 Instagram post stated—in Spanish—that IML "is

[18] Dr. Isaacson's expert report is attached as PX16 ("Isaacson Report"). His report sets forth his qualifications and experience in paragraphs 10-19, the materials he reviewed in paragraphs 20-21, the survey's methodology in paragraphs 29-63, and his findings in paragraphs 65-105. PX16, 320, 325-39, 340-56 (Isaacson Report).

[19] MMR Strategy Group, a marketing research-based company, conducted the survey from June 26, 2024, to August 25, 2024. The survey database contains 660 completed interviews of purchasers of IML's Training Services and former IML salespeople. PX16, 321-23, 339 (Isaacson Report ¶¶23-25, 27, 62). The potential survey respondents consisted of a random sample of individuals who either purchased IML's Training Services or participated in the Business Venture. The consumers' names and email addresses were obtained from IML's customer and salespeople databases. PX16, 325, 381-384 (Isaacson Report ¶29, Ex. 2); PX20, 1803, 1809 (Violette Decl. ¶8, Att. A).

[20] PX16, 348-49 (Isaacson Report ¶¶85-86, Table F).

[21] *Id.*

[22] PX16, 329-30 (Isaacson Report, ¶33). Chris Terry has repeatedly emphasized that eighteen-year-olds are the target demographic for IML. He wrote to Defendant Jason Brown: "That's the great thing about network marketin[g]...They keep making new 18 year olds everyday." PX25, 5056 (2nd Tyndall Decl., Att. Z). And in a holiday message to IML members that was captured in a BBC documentary about IML, Terry said: "I'll tell you a secret. Everybody. You have to be 18 years old to join our company, and I know people snuck in earlier, you know, with their fake IDs. Every second, there's new 18-year-olds. There is an overabundance of people that are qualified to do what we do that can come into your business." PX23, 1856, 2211-12 (Graham Cordova Decl. ¶16, Att. AT). *See also*, PX1, 1, 3, 22-44 (Williams Decl. ¶¶2, 11, Att. F, G);

designed so that someone who is 11 years old can master it."[23] According to the Isaacson Survey, the scheme has disproportionately harmed young Black consumers.[24] Defendants have also capitalized on consumers' fears about the COVID pandemic to sell their products and services. For example, an IML salesperson posted the below image on Instagram on or about March 5, 2021, along with the following statement:

> I'm now hosting private webinars to show you how I made 6 figures in 6 months at 23 [years old] from my phone…I literally get paid to use my social media[.] Now it's your turn[.] Working is no longer an option for me in 2021 because there's no more job security at this point. This is the easiest time to get rich. Let me show you how to turn the pandemic into a BANDemic.

The salesperson referred to a "band," which is slang for $1,000 in cash.



**Figure 3**: Screenshot of IML Salesperson's Social Media Posting.[25]

---

PX2, 108 (Ramos Decl. ¶1); PX3, 113-14 (Meeker Decl. ¶¶2-3, 8-9); PX8, 167 (Skouloudis Decl. ¶2); PX11, 185 (Rose Decl. ¶2).

[23] PX25, 2714 (2nd Tyndall Decl. ¶29).

[24] PX16, 329-30 (Isaacson Report ¶33).

[25] PX1, 7, 107 (Williams Decl. ¶30, Att. U).

8

1

### B. IML's Business Model Layers Deception on Deception

2

3      After consumers purchase the Training Services, Defendants pitch participating in the

4      Business Venture as salespeople for IML. Defendants and IML salespeople represent that those

5      who participate in the scheme can earn lucrative commissions by recruiting new IML

6      customers.[26] The Isaacson Survey found that over 76% of former IBOs surveyed indicated that

7      IML or its representatives said or suggested that becoming an IBO would provide the ability to

8      make substantial money.[27]

9      IBOs currently pay a monthly fee to IML of $24.95 to be eligible for commissions and

10     bonuses.[28] The more salespeople and customers a salesperson recruits, the more commissions

11     and bonuses that salesperson earns.[29] IML has ranked its IBOs from "Platinum 300" to

12     "Chairman 750," based on their sales volume, with advancement in rank corresponding with

13     increased commissions and bonuses.[30] Chairman 750 IBOs can earn $750,000 a month.

14     Defendants refer to high-earning and influential salespeople as "leaders," and the salespeople

15     who were recruited by them as their "downline" or "team." Under IML's newest brand,

16     "IYOVIA," salespeople with greater sales volume also earn higher commissions.[31] Top earners

17     are now referred to as reaching the "Titanium" level rather than "Chairman."[32]

18

19

20     _____

21     [26] *See, e.g.*, PX24, 2257, 2270, 2435 (1st Tyndall Decl., Att. A, B, Q).

22     [27] PX16, 354-55 (Isaacson Report ¶¶ 96-99, Tables K, L).

       [28] PX24, 2235 (1st Tyndall Decl. ¶29).

23

24     [29] *See, e.g.*, PX24, 2434-57 (1st Tyndall Decl., Att. Q, R) ("Your financial income in IM Mastery
       Academy is directly related to your efforts in sharing the education services, and building a sales

25     organization. Our compensation plan pays out through six (6) powerful ways and is one of the
       most lucrative opportunities in the industry!").

26     [30] PX24, 2462 (1st Tyndall Decl., Att. S).

27     [31] *Id.* at 2634 (1st Tyndall Decl., Att. SS).

28     [32] *Id.*

                                               9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.  Defendants' Deceptive Telemarketing

IML sells Training Services and the Business Venture through deceptive earnings claims conveyed to consumers via telemarketing.[33] IML has received complaints from consumers about its deceptive telemarketing practices.[34] Over 34% of the 653 IML consumers who completed the Isaacson Survey indicated that, before they purchased the Training Services, IML or its representatives said or suggested on a telephone call that those products or services would likely allow them to make substantial money from trading.[35] And over 40% of consumers indicated that, *after* they purchased the Training Services, IML or its representatives said or suggested on a telephone call that purchasing additional services would provide the ability to make even more money from trading.[36]

IML's contracts with its IBOs anticipate that IBOs will sell IML's Training Services and Business Venture via telemarketing; the IBO agreement provides specific direction on how to conduct such telemarketing. For example, IML's Statement of Policies and Procedures, which is incorporated into the IBO agreement, explicitly permits IBOs to make sales calls: (i) "in response to the prospect's personal inquiry or application" regarding an IML service sold by the IBO; (ii) to "family members, personal friends, and acquaintances"; and (iii) to consumers if the salesperson "has an established current business relationship with the prospect."[37] Under IYOVIA's Statement of Policies & Procedures, IML retains authority to review and approve

---

[33] See, e.g., PX4,116-17 (Gonzalez Decl. ¶¶4, 6); PX8, 167 (Skouloudis Decl. ¶2); PX9, 172 (Decema Decl. ¶3); PX13, 296-97 (Salinas Decl. ¶3); PX14, 298 (Neumann Decl. ¶5); PX15, 308 (Levaggi Decl. ¶¶9, 10).

[34] PX25, 5545-48, 6868-74 (2nd Tyndall Decl., Att. Z).

[35] PX16, 350-53 (Isaacson Report ¶¶87-90, 93-94, Tables H, J).

[36] *Id*. at 350, 352-53 (Isaacson Report ¶¶87-89, 92-96, Tables I, J).

[37] PX24, 2336, 2431-32, 2526 (1st Tyndall Decl., Att. I, P, V).

marketing materials.[38]

Defendants encourage and coach IBOs on how to telemarket IML's products and services. For example, in a January 2024 video presentation by Defendant Alex Morton that was posted and distributed via IML's YouTube account, Morton instructs IML salespeople on how to "prospect" and "close" sales, directing IML salespeople to "pick up the stinking freaking phone and talk to people," and to "pick up the phone and start dialing."[39] In another video from April 2021, Defendant Matt Rosa directs IML salespeople to contact consumers on the telephone, stating: "over the course of the next hour we're going to be making calls non-stop, following up with absolutely everyone…everyone in this room needs to be making calls…the first thing that you're going to do you're going to jump on the phone." In the video, Rosa states that he reached the Chairman level in 63 days by "picking up the phone, picking up the phone, picking up the phone." Rosa also states that he will coach salespeople to improve their telemarketing sales pitches.[40] Another top sales leader, Tia Rivera, created a "Chairman Cheat Code" instructional manual for IBOs; the guide includes telemarketing scripts and suggests IBOs create a "prospect" list by "writ[ing] down every single person you have a phone number for who is not already involved in [IML]."[41] The manual includes a list of "rebuttals" to deal with consumers' questions

---

[38] PX24, 2521-22 (1st Tyndall Decl., Att. V).

[39] In that same video, he instructs IBOs to dangle the prospect of easy money to lure consumers into purchasing IML's services: "Hey, man, if I can show you a way to make enough money part-time, would you take a look at something? Hey, Brian, hey, man, if I can show you a way to make extra money from your cell phone, would you watch a video?" PX24, 2295-96, 2299 (1st Tyndall Decl., Att. E).

[40] PX24, 2304 (1st Tyndall Decl., Att. F). In a subsequent group chat with IBOs, Rosa coaches them to follow up with prospective consumers on the phone by asking them if they "saw what [IML] offered," and noting "the growth in [IML] has been drastic." PX25, 6857 (2nd Tyndall Decl., Att. Z).

[41] *Id*. at 5930. Rivera shared the "Chairman Cheat Code" with IML's then-Chief Marketing Officer and Jason Brown. *Id*. at 5920. The manual also directs salespeople to set up "3 way calls" with prospective consumers and the salesperson's "up-line leader," to "close the deal." *Id*. at

about IML. Salespeople are told to refer to the foreign exchange (or "forex") market as a "platform I use to multiply my income" and to assure prospects that "IM Academy provides education that teaches you how to trade with minimal risk no matter the volatility of the market."[42]

Defendant Brandon Boyd has both engaged in telemarketing to sell IML's services to consumers and directed IML salespeople to do so. He has boasted about his telemarketing for IML to Defendants Brown, Morton, and Rosa.[43] He has provided instructions on what to say to consumers on sales calls, including by instructing them to make deceptive earnings claims. For example, in a series of IML-produced videos entitled "IBO Fundamentals Training Course," Defendant Brandon Boyd directs salespeople to contact consumers over the telephone to sell IML's products and services.[44] In one video, Boyd tells IBOs to use "three-way calls" to sell IML's services; he also directs them to ask consumers questions like "what if there was a way to honestly teach you how to multiply your money? Would you want to know about it?"[45]

Defendant Jason Brown also has exhorted IBOs to sell IML's services via telephone calls. In a video posted on Brown's YouTube account that has been viewed over 43,000 times, he tells IBOs to "get your upline on three-way calls [with prospective purchasers of IML's services]" and "do the three-way calls…and the world is yours." IML CEO Chris Terry has also promised IBOs that, "if any of you start popping ranks and you need me…to help you on a call, I'm there for you."[46] And IML CFO Isis Terry has submitted an application for a credit card

5942.

[42] *Id*. at 5952.

[43] *Id*. at 6842-43, 6851-52.

[44] PX23, 1855, 2069, 2084-86 (Graham Cordova Decl. ¶¶10-12, Att. AC, AE).

[45] PX23, 1855, 2084-86 (Graham Cordova Decl. ¶¶10-12, Att. AE).

[46] PX24, 2258 (1st Tyndall Decl., Att. A). In a presentation prepared by the IML then-vice president of compliance about the consequences of deceptive IML earning and lifestyle claims

12

processing account where she listed IML's sales methods as "100%" mail/phone.[47]

### D. The ROSCA Defendants Fail to Disclose Material Terms to Online Purchasers and Fail to Obtain Their Express Consent

ROSCA prohibits charging consumers for goods or services sold in transactions effected on the Internet through a "negative option feature," as that term is defined in the TSR, 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumers' billing information, and (2) obtains the consumer's express informed consent before making the charge. 15 U.S.C. § 8403. Attempting to inoculate themselves from liability for the deceptive claims consumers encounter while being pitched IML's Training Services, Defendants IML, Chris Terry, and Isis Terry (the "ROSCA Defendants") purport to bind purchasers of the Training Services to numerous "Terms of Use." While many of those "Terms" are material to consumers' purchase decisions, they are tucked away in an easily-overlooked page of IML's website; a link to the "Terms" is hidden at the very bottom of IML's lengthy main webpage.[48] From approximately July 2021 until on or about March 10, 2025, the material "Terms" have included the following:

> We provide absolutely no guarantee that you will earn any money or achieve a financial goal using the methods, information and suggestions in the content provided.
>
> Any examples or demonstrations provided are in no way a guarantee or promise that an individual will make financial gains of any kind.
>
> The potential for earnings is totally dependent on the person using our site, products, services, methods and ideas.
>
> The information available through our products and services is provided by third parties and solely for informational purposes on an "as is" basis at the user's sole risk. The

---

intended to be given at a June 2021 Chairman retreat attended by Defendants, he specifically noted that such claims made during "telephone calls" were within the scope of the warning. PX25, 5386 (2nd Tyndall Decl., Att. Z).

[47] PX25, 6758 (2nd Tyndall Decl., Att. Z).

[48] PX24, 2245, 2659-65 (1st Tyndall Decl. ¶¶50-51, Atts. XX;YY).

13

information is not meant to be, and should not be construed as, advice or used for investment, financial planning, legal, accounting, or tax purposes. We make no guarantees as to the accuracy, quality, or completeness of the information and the company shall not be responsible or liable for any errors, omissions, inaccuracies in the information or for any user's reliance on the information.[49]

IML's revised "Terms of Use," which are dated March 10, 2025, remain located in an easily-overlooked page of IML's site, and include the following material terms:

The information available through our products and services is not meant to be, and should not be construed as, advice or used for investment, financial planning, legal, accounting, or tax purposes.

We provide absolutely no guarantee that you will earn any money or achieve a financial goal using the methods, information, and suggestions in the content provided. Any examples or demonstrations provided are in no way a guarantee or promise that an individual will make financial gains of any kind.[50]

Until about June 2021, the ROSCA Defendants also purported to bind purchasers to "Terms and Conditions" tucked away in an easily-overlooked page of their website.[51] Those "Terms" include the following material terms:

There are major risks in trading, investing, and day trading online, which makes it unsuitable for everyone.

This website does not provide or recommend a "get rich scheme" or a "make money scheme."

Considerable risks in Futures & Forex transactions exist. Those risks include without limitation, leverage, creditworthiness, limited regulatory protection and market volatility that may substantially affect the price, liquidity of a currency or currency pair or Futures Contract.

International Markets Live, Inc. does not represent itself as an Investment Advisor, or investing in Stocks, Futures, or Equities. We therefore do not provide any kind, whatsoever, of investing advice.[52]

---

[49] PX24, 2237-38, 2546-58 (1st Tyndall Decl. ¶33, Att. AA).

[50] PX24, 2638 (1st Tyndall Decl., Att. TT).

[51] PX24, 2245, 2656-58 (1st Tyndall Decl. ¶¶48-49, Att. WW).

[52] PX24, 2238, 2559 (1st Tyndall Decl. ¶34, Att. BB).

14

The ROSCA Defendants therefore do not clearly disclose all material terms of the transaction to purchasers who purchase IML's Training Services online prior to obtaining the purchasers' billing information.[53] The ROSCA Defendants also fail to obtain purchasers' express informed consent to those terms before charging them for Defendants' Training Services in online transactions involving a negative option feature.

### E. IML Controls Its Salespeople and Consumers Understand IML's Salespeople are Representatives of IML

IML controls how its salespeople market the Training Services and Business Venture. IML sets the terms under which salespeople are compensated.[54] IML controls how its salespeople present its Training Services and Business Venture to prospective purchasers, including how they communicate with consumers, and IML prohibits the sale of its services except through its website.[55] In order to participate in the Business Venture, IBOs must agree to IML's Statement of Policies and Procedures, which explicitly states that consumers recruited by an IBO are customers of IML and not of the individual IBO.[56] At times, IML reviews

---

[53] The ROSCA Defendants charge consumers for IML's services through transactions effected on the Internet. PX24, 2228-33, 2520 (1st Tyndall Decl. ¶¶14-25, Att. V). Defendants offer membership in their Training Services for a specific period, typically for four weeks. PX24, 2229-31, 2235, 2630 (1st Tyndall Decl. ¶¶16-19, 25, 29, Att. SS). IML's Training Services include an auto-renew feature that is a negative option. *Id*. Defendants have typically charged consumers between slightly less than $100 to nearly $400 every four weeks, unless the consumer acts to cancel. Thus, Defendants automatically renew consumers' memberships and the renewed membership charges are applied to the consumer's credit card or original payment method, unless and until the consumer cancels prior to the auto-renewal. IML has earned over $633 million in recurring fees from online sales of the Training Services.

[54] PX24, 2434-69, 2629-37 (1st Tyndall Decl., Atts. Q-S, SS).

[55] PX24, 2520, 2525-26, 2651-55 (1st Tyndall Decl., Atts. V, VV).

[56] PX24, 2497 (1st Tyndall Decl., Att. V) ("All Customers solicited by an IBO for the promotion or sale of IYOVIA services are deemed to be Customers of IYOVIA and not of the IBO, whether or not the IBO originally introduced such Customer to IYOVIA.").

15

salespeople's marketing materials and makes changes to those materials.[57] IML has the ability to discipline and terminate IBOs for failing to follow Company policies, including by issuing fines to IBOs.[58] IML prohibits IBOs from marketing the same or similar products to consumers who purchased IML's services, and also prohibits salespeople from recruiting other IML salespeople to participate in a different MLM, even after the salespeople have left IML.[59] IML has brought a number of lawsuits to enforce these provisions against former IBOs.[60]

Not only does IML dictate how IML salespeople market the Training Services and the Business Venture through its contracts, training, oversight, and litigation, IML also directs its salespeople's conduct through a steady stream of communications across multiple platforms. These include in-person conferences, text messages, YouTube videos, WhatsApp group chats, Telegram channels, motivational webinars, and social media posts.[61] Top IBOs, known as IML "leaders," have weekly calls with IML's executives and are involved in Company decision-

---

[57] PX25, 6822-23 (2nd Tyndall Decl., Att. X) (Boyd Interrogatory No. 34 Resp.) (Boyd submitted Power Point presentations to Company for approval and "[IML] proposed changes on a few occasions to words and logos"); *id*. at 4740 (Martin Req. for Doc. No. 8 Resp.) (Company ordered salesman Michael Angel Martin to cease using custom website to attract customers); *id.* at 4576 (GDN Interrogatory No. 22(a) Resp.) (Company reviewed and approved defendants Brown and Rosa's PowerPoint presentation used during sales events and marketing videos created by Brown and Rosa).

[58] PX24, 2500-01, 2508-10 (1st Tyndall Decl., Att. V).

[59] PX24, 2496 (1st Tyndall Decl., Att. V).

[60] *See, e.g.*, *Int'l Mkts. Live, Inc. v. Manny Quinonez*, Case No. A-24-893769-C (Dist. Ct., Clark County Nev. May 21, 2024); *Int'l Mkts. Live, Inc. v. De'el Woods*, Case No. 2:22-cv-00254 (D. Nev. Feb. 10, 2022); *Int'l Mkts. Live, Inc. v. Tylen Figueroa Delaney*, Case No. 2:21-cv-01241-JAD-VCF (D. Nev. July 1, 2021).

[61] *See, e.g.*, PX24, 2218-28, 2251, 2254-86 (1st Tyndall Decl. ¶¶1-13, Atts. A-C); PX23, 1855, 1941-2204 (Graham Cordova Decl. ¶¶10-12, Atts. O-AR); PX25, 4553-54, 4655-56, 6549-70, 6671-6706 (2nd Tyndall Decl., Atts. X, Z) (Chris Terry Interrogatory No. 22 Resp.; Isis Terry Interrogatory No. 23 Resp.).

making.[62] Chris Terry, along with Defendants Jason Brown, Alex Morton, Matt Rosa, and Brandon Boyd, have routinely communicated with IML salespeople and frequently have exhorted them to sell IML's services using specific techniques and methods; i.e., through telemarketing (*see supra*, Statement of Facts, Section I.C).[63] Another example is the use of the "edification" sales tactic. A key part of the IML sales process involves IML salespeople "edifying" IML's top leaders—boasting about the wealth and success of top earners like Morton, Rosa, and Brown, to convince consumers that IML's Training Services and Business Venture are paths to riches. IML, Morton, Brown, Rosa, and Boyd all have instructed salespeople to "edify" top leaders to sell IML services.[64]

### F. Defendants Attempt to Hide Behind a Compliance Program They Actively Undermine to Further Their Salespeople's Deception

Defendants have continued to operate the IML scheme with full knowledge that their and their salespeople's earnings claims are deceptive and unlawful. IML has been the subject of multiple law enforcement actions, has received over 650 consumer complaints from the Better Business Bureau, has been the subject of multiple press exposés, and has been subject to an inquiry by the Direct Selling Self-Regulatory Council ("DSSRC")[65] for its deceptive earnings claims.[66] Rather than ordering their salespeople to stop making such claims, or taking

---

[62] *See, e.g.*, PX25, 5178 (2nd Tyndall Decl. Att. Z) (IML staffer reminds top IBOs there will be a "leaders weekly call tomorrow").

[63] *See, e.g.*, PX24, 2218-21, 2254-86, 2291-2317 (1st Tyndall Decl. ¶¶4-6, Atts. A-C, E-H); PX25, 6458-65, 6542-55, 6612-6706 (2nd Tyndall Decl., Att. Z).

[64] PX23, 1855, 2073-80 (Graham Cordova Decl. ¶¶10-11, Att. AD); PX17, 1138 (1st Patten Decl., Att. T); PX19, 1538-39 (2nd Patten Decl., Att. J); PX24, 2227-28, 2306-07, 09 (1st Tyndall Decl. ¶¶10, 12-13, Att. G); PX25, 5139-40, 5943 (2nd Tyndall Decl., Att. Z).

[65] The DSSRC is a self-regulatory program that was created by the Direct Selling Association, the national trade association for the direct selling industry. PX17, 877 (1st Patten Decl. ¶18).

[66] PX23, 1856, 2205-17 (Graham Cordova Decl. ¶16, Att. AT); PX24, 2670-89 (1st Tyndall Decl., Atts. BBB, CCC); PX25, 6707-11, 6880-81 (2nd Tyndall Decl., Att. Z); PX17, 877-78, 932-38, 972-83 (1st Patten Decl. ¶¶17-19, 24, Atts. G, M).

appropriate corrective actions, Defendants have rewarded top salespeople that make deceptive claims, schemed to continue defrauding consumers, and directed their salespeople to disguise their unlawful conduct to prevent law enforcement action against the scheme.

Since at least 2018, when consumer watchdog Truth In Advertising ("TINA") first confronted IML about the scheme's earnings claims, IML has told consumer advocates, self-regulatory bodies, and payment processors that it strictly adheres to consumer protection laws by closely monitoring and enforcing IML compliance policies against deceptive earnings claims.[67] In 2021, IML's then-Chief Legal Counsel wrote in a letter to a payment processor that a salesperson who violates IML's policies three times will be terminated.[68]

### i. Defendants Knowingly Subvert IML's Compliance Programs

Contrary to its claims, IML has not followed its "3 strikes and you're out" policy. Instead, IML has richly rewarded salespeople that make deceptive earnings claims, and the salespeople that have flouted IML's policies most flagrantly—consequently recruiting more consumers—have frequently been the most successful. Attached as **Appendix A** to this Motion is a table listing 22 highly-paid IML salespeople, the amount each has earned from IML, and the number of times each salesperson has made deceptive earnings claims that were either reported by third parties to IML or located by IML's compliance staff. All of these salespeople, who collectively earned over $249 million from the IML scheme, should have been terminated under IML's stated policies. Instead, all of them continued earning commissions after committing 3 (or in many cases, more) earnings claim violations. While some of these salespeople ultimately left

---

[67] PX17, 875-78, 951-60, 967-71, 898-915 (1st Patten Decl. ¶¶10-11, 21, 23, Atts. C, J, L); PX25, 4869 (2nd Tyndall Decl., Att. Z).

[68] PX25, 4874 (2nd Tyndall Decl., Att. Z). In 2023, IML wrote to another payment processor that, "The Company adopts a 3-phase approach - first event of non-compliance counsel and warn; second event - counsel second warning and suspend until issue corrected and third event - termination. An IBO's account is then changed to permanently inactive. The stages can be escalated depending on the severity of the allegations." *Id*. at 6364, 6373.

IML to pursue other ventures, many—including Defendants Brown, Rosa, and Boyd—stayed with the scheme until the Complaint in this matter was filed.

While paying lip service to compliance, IML CEO Chris Terry has repeatedly allowed top earners for IML to operate with impunity, despite the recommendations of compliance staff.[69] A few examples:

- **Garrett Roberts**: On November 28, 2021, Chris Terry sent a text message to salesperson Garrett Roberts, attaching a picture of Roberts wearing a gold chain in a social media post; Terry told Roberts that he would face a suspension from IML for the post.[70] Terry also referred to the FTC Synopsis Concerning Money-Making Opportunities (then-titled "Notice of Penalty Offenses"), which IML had received.[71] Roberts responded "[o]nly person I seen flashing jewelry is your top guys…Talking about their watches."[72] At the time Chris Terry texted Roberts, Roberts had already been reported seven times

---

[69] On June 11, 2019, IML's then-Senior Manager of Compliance Dawn Dion wrote to the COO about several top salespeople's earnings claims. She noted that "suspensions are overruled mostly" and "we are losing grip on the field again as word spreads that suspensions are over ruled" and compliance staff were being "blocked [on social media] and ignored." PX25, 5881 (2nd Tyndall Decl., Att. Z). On November 24, 2020, Dion wrote to other compliance team staffers: "Chris [Terry] could flip if we suspend one of the main leaders without him knowing." *Id*. at 6716 (2nd Tyndall Decl., Att. Z). And on October 28, 2022, Dion wrote, in response to Chris Terry reinstating an IML salesperson: "I see it as I work for CT [Chris Terry]. And that's what he wanted. Everyone is upset but at end of the day it's Chris's company." IML's then-head of compliance responded, "When things like this occur make sure you email me what you have been told to do and by whom please…. That way its documented and my ass is covered from the FTC." *Id*. at 5881 (2nd Tyndall Decl., Att. Z).

[70] *Id*. at 6310-11.

[71] *Id*. at 5957-5970. The Synopsis noted that IML could be subject to civil penalties for violations of the FTC Act in connection with its marketing claims. The Synopsis stated that it is an unfair or deceptive trade practice to make false, misleading, or deceptive representations concerning the profits or earnings a participant in a money-making opportunity can expect. The Synopsis was later sent to all Defendants. PX24, 2252 (1st Tyndall Decl. ¶¶60-62).

[72] PX25, 6313 (2nd Tyndall Decl. Att. Z).

19

previously to IML's compliance staff for deceptive earnings claims.[73] Instead of terminating Roberts, IML continued paying him commissions. Roberts recently was promoting IML's rebranded "IYOVIA" services with Chris Terry.[74] In June 2024, IML compliance staff discussed how they had been instructed "not to touch" Roberts' and Defendant Morton's social media accounts, noting "same old same old."[75]

- **Austin Godsey**: As early as June 2018, IML admitted to TINA that salesperson Austin Godsey's earnings claims were "non-compliant" with IML's policies.[76] In January 2021, Chris Terry approved increasing Godsey's compensation so that he was earning at the Chairman 250 level, even though Godsey already had seven earnings claims violations at that point, and he did not meet the compensation plan requirements to earn at the Chairman 250 level due to his "compliance violations."[77] IML compliance staff had earlier flagged that Godsey had been "warned more than anybody [about making earnings claims] and still does it."[78] Later, in November 2021, Chris Terry wrote to Godsey that "I am literally in fear Everyday we are gonna have investigation from FTC."[79] But Godsey continued to receive payments from IML until August 2022, incurring nine total earnings claim violations in IML's compliance system.[80]

---

[73] *Id*. at 2711, 3882-4003 (2nd Tyndall Decl. ¶18, Att. M).

[74] PX24, 2616 (1st Tyndall Decl., Att. PP).

[75] PX25, 6738 (2nd Tyndall Decl., Att. Z).

[76] PX17, 910 (1st Patten Decl., Att. C).

[77] PX25, 2709, 3266 (2nd Tyndall Decl. ¶10, Att. E).

[78] Juan Cruz, an IML compliance staffer, told Kyle Lowe, IML COO, on March 27, 2019: "Austin has been warned more than anybody and still does it.... SMH [Shaking my Head]...Chairman 100 Austin Godsey...has been warned over 10 times, 4 by me alone." PX25, 5215 (2nd Tyndall Decl., Att. Z).

[79] *Id*. at 6291.

[80] PX20, 1806 (Violette Decl. ¶20), PX25, 2709, 3131-3272 (2nd Tyndall Decl. ¶10, Att. E).

- **Bryce Thompson**: In a 2021 text exchange with a salesperson on Bryce Thompson's team, Terry wrote that Thompson and his team engaged in "[d]eceptive marketing," and "predatory marketing [to] [m]inors[,] 14-16 year olds."[81] He also noted that the team's success was "all based on bullshit claims" and "we have [an] FTC investigation for all their shit that was allowed and encouraged."[82] Despite this knowledge, Terry continued to authorize the payment of large sums to Thompson and his team. As Defendant Brown remarked to Chris Terry in a 2021 text, "Bryce [Thompson] should be kissing your feet...Seriously...You let all his leaders off the hook basically."[83] IML continued to pay Thompson until late March 2022.

- **Jaylin Goss**: In September 2021, Jason Brown sent Chris Terry a report by IML's compliance consultant, Anita "Ari" Barton, detailing allegations that salesperson Jaylin Goss made earnings claims, solicited minors, was engaged in loan fraud involving the COVID-era Paycheck Protection Program, and had encouraged IML participants to engage in similar fraud.[84] At that point, Goss already had 5 outstanding complaints for deceptive earnings claims.[85] Chris Terry's response was simply: "I told Bryce [Thompson] to tell jaylon and all leader clean up income claims and minors."[86] Later in September 2021, Ari Barton shared a photo of Goss wearing a large gold chain with Jason Brown and Chris Terry.[87] Goss was paid by IML until April 2022.[88]

---

[81] PX25, 6248 (2nd Tyndall Decl., Att. Z).

[82] *Id.*

[83] *Id.* at 6239.

[84] PX25, 6181-82; 6188 (2nd Tyndall Decl., Att. Z).

[85] PX25, 2710, 3273-3386 (2nd Tyndall Decl. ¶11, Att. F).

[86] PX25, 6186-87 (2nd Tyndall Decl., Att. Z).

[87] *Id.* at  6227-28.

[88] PX20, 1806 (Violette Decl. ¶20).

21

- **Tia Bolden**, who has 17 earnings claim violations documented in IML's compliance database, has until recently been a salesperson for IML's rebranded "IYOVIA" services—and has continued to make earnings claims.[89] As one of IML's compliance staffers noted in June 2023, "[w]e knew she was going to be trouble."[90]

Defendants, including IML's compliance staff, have conspired to further the scheme by instructing salespeople on how to continue to make deceptive claims "under the radar" of the compliance program and law enforcement. For years, IML went so far as to make it the Company's policy to prohibit its salespeople from using the Company's name, or hashtags identifying IML, in social media posts.[91]

Defendants Brown, Rosa, and Morton were all involved in IML's decision to not use IML's name in salespeople's marketing to evade FTC oversight. In June 2020, in a text exchange that included Chris Terry and the then-head of IML compliance, Defendant Morton wrote in response to a suggestion that salespeople stop using IML's name on social media in light of a recent FTC enforcement action against another training scheme: "Yes. We CAN do this, will take time and effort but we CAN & SHOULD. We want to be here in 10 years. That happens by staying under the radar."[92] Defendant Rosa replied: "I'm down for a blackout. None of us use company [name] as it is. And I'm down to hold [salespeople] accountable as well love the idea

---

[89] PX25, 2709, 2794-3060 (2nd Tyndall Decl. ¶7, Att. B); PX24, 2246-47 (1st Tyndall Decl. ¶¶52-53). IML's compliance staff are aware that Tia Bolden used the Instagram account "fire.investing" to post deceptive earnings claims. PX25, 6750-54 (2nd Tyndall Decl., Att. Z).

[90] PX25, 6750-52 (2nd Tyndall Decl., Att. Z).

[91] *Id*. at 2856, 6479, 6503, 6398 (2nd Tyndall Decl., Att. Z). After IML received a copy of the complaint in this matter, they rebranded and modified their Social Media Guidelines. Although they no longer prohibit using the scheme's name, IML significantly circumscribes IBOs' use of the new dba—IYOVIA. PX24, 2520-22, 2651-52 (1st Tyndall Decl., Att. V, VV).

[92] PX25, 6412 (2nd Tyndall Decl., Att. Z).

bro."[93] And Brown concurred: "As much as I like the idea of social media, I REALLY like the idea of 20-30-40 years of making this impact and money… If no one knows we exist … do we?"[94] Brandon Scott, IML's then-Chief Marketing Officer, responded that IML was already discouraging salespeople from using IML's official logo, in order to "keep that safe distance."[95] In that same text chain, a member of IML's compliance group raised a point about the use of hashtags in social media, noting, "Company related Hashtags and the company being tagged in posts is what leads to posts to being connected to the company. I would look at that as well. Some people have never been cited [by IML compliance staff] because they never tag the company in posts."[96]

On September 7, 2020, an IML compliance employee announced the new policy to 290 individuals—including IML corporate executives and top salespeople for IML—in a group text conversation.[97] The policy provides: "It is prohibited to tag the company in any social media posts. ie. @imacademy[.] In addition, do not use any company related hashtags. Ie. #imacademy, #imarketslive."[98] She also wrote: "Please remember to not tag the company in your social media posts."[99] Thereafter, IML has repeatedly warned and disciplined salespeople who used the scheme's name in social media posts.[100]

---

[93] *Id.* at 6413.

[94] *Id.* at 6412.

[95] *Id*. at 6414, 5378.

[96] *Id.* at 6416.

[97] *Id*. at 6473-75, 6479, 6503.

[98] *Id*. at 6503.

[99] *Id*. at 6479.

[100] *See, e.g.*, *id*. at 5857, 5976 (January 28, 2021 and April 25, 2022 compliance violation notices to IML salespeople for using IML's name). In September 2020, a compliance staffer informed repeat-offender Tia Bolden that she should not "tag the company in any posts since this is highly frowned upon by the regulators." PX25, 2856 (2nd Tyndall Decl., Att. B). In fact, while

23

Defendants have also engaged in a variety of other activities to "stay under the radar" of law enforcement and disguise their unlawful activity. Defendants Brown and Rosa repeatedly took steps to ensure that they and other IBOs could continue to make deceptive earnings claims online without TINA or the FTC locating those claims.[101] Brown has arranged for IML to contract with a company that posted fake positive reviews of IML's services.[102] And he has also interceded for IBOs to avoid consequences for earnings claims.[103]

### G. Defendants' Disdain for Law Enforcement

Defendants not only direct their salespeople to avoid the notice of law enforcement; they have continued to operate despite 21 international government agencies issuing warnings about

---

deceptive earnings claims violate FTC and Nevada law, using a company's name in social media posts do not.

[101] For example, Brown registered concern over deceptive earnings claims in a sales video featuring Brown and Rosa. Rosa responded that they should make the video private so it could only be seen by individuals with a link to it. That way, he said, TINA "can't find what they can't find." PX25, 6836-37 (2nd Tyndall Decl., Att. Z). Defendants Brown and Rosa have also discussed how to use the "close friends" function on Instagram to post earnings claims on that platform so that, as Rosa put it in May 2021, "the FTC can't see it." *Id*. at 5150. Brown, after stating that IML had received a warning from the FTC, recommended that another IML salesperson only post earnings claims on the "close friends" setting. *Id*. at 5198. In a June 2020 text message exchange with high-level salespeople, including Defendants Boyd, Morton, and Rosa, IML's then-COO, and the Company's then-vice president of compliance, Brown noted that: "the young leaders have started to use the close friends feature which is great to show lifestyle but not keep it public at all." *Id*. at 6430.

[102] *Id*. at 4978-79, 5022-23.

[103] In May 2023, Brown pressured compliance staff at IML to be lenient with top salesperson Michael Angel Martin. Even though Martin had committed multiple violations of IML's compliance policies and had repeatedly been found to be making deceptive earnings claims, Brown pointed out that Martin was "the strongest USA Leader," "extremely valuable to our business," and a "top customer recruiter [of] all time." *Id*. at 6381-82. Ultimately, Martin was only suspended for seven days, even though he should have been terminated under IML's policies because he had four previous earnings claim policy violations. *Id*. at ¶15.

the scheme.[104] In addition, both the U.S. Commodity Futures Trading Commission ("CFTC")[105] and Canadian law enforcement have taken legal action against IML,[106] and in March 2022, several IML IBOs were arrested by the Spanish National Police for, among other things, targeting adolescents for recruitment into IML.[107] Rather than being deterred, Defendants have repeatedly shown disdain for law enforcement agencies tasked with policing their unlawful conduct. For example, Chris Terry sent Defendant Brown a link to an article discussing the arrest of Spanish IBOs via text message; he then wrote "Big deal...Who cares," and Brown responded "Exactly." Terry then replied: "who gives two fucks not me."[108]

In another text message exchange among top IML salespeople discussing how the FTC would seek to shut down IML if the scheme exploited consumers' fears about the COVID-19 pandemic, Defendant Rosa wrote "Stop posting about [the COVID-19] crisis and the company...FTC don't play that shit...And will shut us down...Hope FTC gets corona...Fuckers."[109] In a May 2021 WhatsApp group chat with Defendants Chris Terry, Alex

---

[104] *Id.* at 6707-6711 (2nd Tyndall Decl., Att. Z).

[105] In September 2018, the CFTC issued an order both simultaneously filing and settling charges against IML. PX24, 2690-95 (1st Tyndall Decl., Att. DDD) (*In re Int'l Mkts. Live, Inc.*, CFTC No. 18-24 (Sep. 14, 2018)). The CFTC alleged that IML operated a website that exercised discretionary trading authority over some of IML's customers' trading accounts at third-party brokers. *Id.* at 2691. In doing so, IML acted as an unregistered Commodity Trading Advisor ("CTA") and violated the Commodity Exchange Act ("Exchange Act"). *Id.* IML agreed to stop violating relevant sections of the Exchange Act and pay a civil monetary penalty. *Id.* at 2694.

[106] In June 2016, regulators in Quebec issued several orders against a group of individuals including Chris Terry and IML regarding the solicitation of "young, vulnerable clientele" to purchase derivatives and securities. PX24, 2696 (1st Tyndall Decl., Att. EEE). IML and Chris Terry were prohibited from acting as derivatives advisers in Quebec and were ordered to block access to IML's websites. *Id.* In addition, they were ordered not to trade derivatives and securities in Quebec except for themselves and to remove derivatives and securities related material posted on social media. *Id.*

[107] PX24, 2670-72 (1st Tyndall Decl., Att. BBB).

[108] PX25, 6338 (2nd Tyndall Decl., Att. Z).

[109] *Id.* at 5112.

Morton, and Matt Rosa, as well as other top IML salespeople and IML's then-head of compliance, Defendant Brandon Boyd has likened the FTC to "Satan."[110]

Chris Terry has boasted that he keeps cryptocurrency funds on a "cold wallet" to avoid "regulations" and "taxes:" "When u make $$ in crypto...Only u and god know...Bypass regulations [and] taxes...Am sitting on $50m still took over 65m out...But imagine...Making fortunes no taxes...Off grid."[111] In March 2023 IML's then-vice president of compliance recommended that a top salesperson at IML, Darwin Lopez, be terminated because of his repeated deceptive earnings claims and for posting on Instagram "Fuck the FTC."[112] Despite that recommendation, Chris Terry allowed Lopez to remain with IML as a salesperson. Lopez was still promoting IML's services on social media in the fall of 2023 and January 2024.[113] As of October 31, 2023, IML had paid Lopez over $5.8 million.[114]

## II. IML Has No Basis for Claiming Purchasers Will Likely Make Money

Even though IML's marketing and sales process is largely driven by claims of substantial earnings, IML has no basis for representing that purchasers of the Training Services or the Business Venture are likely to make such earnings. In fact, most consumers who purchase the Training Services lose money trading, and nearly all participants in the Business Venture make a pittance or lose money.

### A. Most Purchasers Lose Money Using Defendants' Training Services

As IML has conceded in its interrogatory responses to the FTC's Civil Investigative Demand, the Company does not track the trading performance of purchasers of its Training

---

[110] *Id*. at 6906.

[111] *Id*. at 6125.

[112] *Id*. at 5219.

[113] PX18, 1335, 1359, 1380, 1393-95 (2nd Patten Decl., Att. B); PX19, 1573-78 (3rd Patten Decl., Att. P).

[114] PX20, 1806 (Violette Decl. ¶¶19-20)

26

Services.[115] Thus, IML cannot substantiate its widely disseminated claim that consumers will or are likely to make substantial money with its Training Services. In fact, the vast majority of Training Services purchasers do not earn the promised returns. Eighty-five percent of purchasers surveyed in the Isaacson Survey answered that they either lost money or broke even from trading, or that they did not use what they learned to conduct any actual trades, while merely 8.1% reported that they made any profit by trading.[116] These survey results are consistent with IML's abysmal retention rates. According to IML's own data, 90% of consumers stopped paying for the Training Services within six months, and over 58% stopped paying for the services within one month.[117]

These results are unsurprising, as IML's instructors are anything but the "master" educators and traders IML claims they are. Many instructors have no formal investment training, and what training they have received comes from IML's Training Services.[118] IML's instructors also do not have prior experience working in finance, nor do they possess professional licenses or

---

[115] "IML does not request or track any information on the trading activities or platforms of the educators, IBOs or customers." PX25, 4635 (2nd Tyndall Decl., Att. X) (IML Interrogatory No. 45 Resp.). *See also, id*. at 5538 (2nd Tyndall Decl., Att. Z) (In a May 12, 2021 letter to the BBC, Isis Terry wrote that "IM Academy does not know how much a customer is making from trading as no trading is done from our platform.").

[116] PX16, 344, 347-48 (Isaacson Report ¶¶76-77, 83-84, Tables C, E); *see also*, PX2, 109 (Ramos Decl. ¶8); PX4, 118 (Gonzalez Decl. ¶12); PX5,150-51 (Porter Decl. ¶¶ 6, 10); PX8, 167 (Skouloudis Decl. ¶5); PX9, 173 (Decema Decl. ¶8); PX11, 186 (Rose Decl. ¶6); PX13, 296-97 (Salinas Decl. ¶6).

[117] PX20, 1806 (Violette Decl. ¶17).

[118] PX25, 4538 (2nd Tyndall Decl., Att. X, Boyd Interrogatory No. 1 Resp.) (training consisted of IML-produced videos); *id.* at 4679 (Kirkland Interrogatory No. 2 Supp. Resp.) (same).

27

accreditation.[119] This lack of relevant credentials, experience, or training is of no concern to IML, as it does not require such credentials or experience when hiring instructors.[120]

Moreover, many of IML's instructors are not successful investors[121] and some barely have traded in the financial markets.[122] A lack of success trading in the financial markets is not an impediment to being an instructor for IML, as the Company does not require a history of successful trading.[123] Rather than possessing training education or experience, many of IML's instructors were IML salespeople prior to becoming instructors.[124] Indeed, a number of IML's

---

[119] *Id.* at 4704 (Allen Interrogatory No. 2 Resp.) (no prior experience trading before joining IML); *id.* at 4545 (Boyd Interrogatory No. 4 Resp.) (no professional licenses or accreditation); *id.* at 4606 (Anand Interrogatory No. 5 Resp.) (same).

[120] *Id.*, PX25, 4634-35 (2nd Tyndall Decl., Att. X) (IML Interrogatory No. 44d. Resp.) (stating IML does not request information about "education, titles, prior occupations or teaching . . .[or] licenses held related to investments or brokerages").

[121] *Id.* at 4747-48 (Gomez Interrogatory No. 50 Second Amended Resp.) (admitting multiple years of trading losses despite large gains in S&P 500 index during those years); *id.* at 4562 (Cabral Interrogatory No. 10 Resp.) (showing trading loss during year S&P 500 index returned nearly 30% gain).

[122] *Id.* at 4679 (Kirkland Interrogatory Nos. 4, 10 Supp. Resp.) (instructor with no history of trading); *id.* at 4540 (Boyd Supp. Interrogatory No. 19 Supp. Resp.) (trading consisted of single account valued at $1,585.00); *id.* 4706-11 (Allen Req. for Doc. No. 25 Resp.) (minimal trading activity); *id.* at 4606 (Anand Interrogatory No. 10 Resp.).

[123] At most, after a scandal involving one of its most hyped instructors in late 2021, IML now requires new instructors to submit trading history, albeit without the requirement that the trading meet any metric of success. *Id.*, PX25, 4634-35 (2nd Tyndall Decl., Att. X) (IML Interrogatory No. 44d. Resp.).

[124] *Id.* at 4704 (Allen Interrogatory No. 9 Resp.) (was IML saleswoman for nearly three years before becoming instructor); *id.* at 4544-45 (Boyd Interrogatory Nos. 1 and 5 Resp.) (became IML salesman in 2016 and instructor in 2020); *id.* at 4606-07 (Anand Interrogatory Nos. 11, 12 Resp.) (became IML salesman in 2020 and instructor in 2021). IML is well aware that its purportedly "master educators" are plucked from its salesforce ranks. *Id.* at 5574 (Luning Decl. ¶14) ("Virtually all Educators started as IBOs"); *see also id.* at *4768* (Chris Terry July 25, 2023 Dep. Tr. at 91:12-93:07) (testifying that an IBO becoming an instructor gave the IBO added "relevance" and helped her build her IBO team).

1
2

IBO-instructors received additional compensation tied not to the results their students achieved

3

in the markets, but to the sale of specific Training Services.[125]

4

Defendants have long been aware that IML's Training Services do not provide consumers

5

with the promised returns. In April 2021, Chris Terry and Defendant Brown discussed a BBC

6

documentary that detailed how poorly consumers fared when they traded using IML's

7

services.[126] While sharing the video with Brown, Chris Terry commented, "so it's our fault

8

lol…We need massive PR to combat this in the UK." Brown responded: "As long as regulators

9

don't get involved…Our team don't care about Media."[127]

10
11

**B.  Most Participants in Defendants' Business Venture Make Little or No
    Income, and Many Lose Money**

12

Defendants know that nearly all IML IBOs either lose money or make very little. IML's

13

income disclosure statements ("IDS") consistently show that the vast majority of IBOs make

14

very little or no money.[128] For example, IML's 2022 IDS shows that nearly 80% made less than

15

$500 in 2022.[129] For those salespeople, the average annual earnings was $77.51, and the median

16

IBO made no money at all.[130]

17

And even the pitiful earnings levels reported in IML's IDS are misleading, as they omit

18

significant fees that all salespeople must pay IML to be eligible for commissions. For example,

19
20
21
22

[125]PX25, 6859 (2nd Tyndall Decl., Att. Z) (Gomez Interrogatory No. 18 Second Amended Resp.) (IML compensation based in part on sales of an IML cryptocurrency trading service); *id*. at 6914-15 (Saini Rog. No. 11 Response) (IML compensation based in part on sales of add-on product).

[126] PX 23, 1856, 2205-17(Graham Cordova Decl. ¶16, Att. AT).

23

[127] PX25, 6848-49 (2nd Tyndall Decl., Att. Z).

24
25
26

[128] An Income Disclosure Statement is a document that some MLMs use to summarize the earnings that consumers can generally expect if they join the MLM. IML's IDS is hard to find and can only be accessed through a link in small font at the bottom of IML's main website. PX24, 2232, 2659-2665 (1st Tyndall Decl. ¶24, Atts. XX, YY).

27

[129] PX24, 2351 (1st Tyndall Decl., Att. N).

28

[130] *Id*.

after accounting for such fees, in 2022, 83% of salespeople in the United States made $500 or less, and the majority of participants lost money.[131] As illustrated below in the pie chart created by the FTC, based on IML's compensation data, between 2020-2022, more than 99% of IML IBOs worldwide made less than $25,000 a year, with more than 80% making less than $500 a year.[132] Only 0.17% made $100,000 or more a year, and 45% lost money.[133]

In reality, the numbers are even worse, because the chart does not include other costs associated with being an IBOs, such as advertising, lodging, and travel expenses. The Isaacson Survey found that over 78% of former IBOs surveyed reported spending money recruiting new customers or IBOs, and of those IBOs, 50% spent $500 or more on recruiting expenses.[134]



## Annual Earnings of IML IBOs Minus IBO Fees 2020–2022*

**0.17%** or less than 2 people out of one thousand made $100,000 or more

**99.23%** made under $25,000

**80.48%** made under $500**

\* <u>Does not</u> include other costs associated with being an IBO, such as advertising costs, travel, and lodging expenses, etc.
\*\* 45% of all IBOs actually lost money

**Figure 4**

---

[131] PX20, 1830 (Violette Decl., Att. K).

[132] *Id*. at 1838 (Violette Decl., Att. O).

[133] *Id*.

[134] PX16, 355-56 (Isaacson Report ¶¶100-04, Tables M, N).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III. The Defendants

#### A. Corporate Defendants

**International Markets Live, Inc.** ("the Company"), also doing business as iMarketsLive, IM Mastery Academy, IM Academy, and IYOVIA, is a New York corporation with places of business at 3750 South Las Vegas Blvd., Las Vegas, Nevada, 89109, 2900 W Horizon Ridge Pkwy Suite 200, Henderson, Nevada 89052, and 2450 St. Rose Parkway, #120, Henderson, NV, 89074.[135] The Company also has used 108 Village Square, #146, Somers, New York, 10589 as a mailing address.[136] Since 2021, the Company has been registered as a foreign corporation doing business in Nevada.[137]

**IM Mastery Academy Ltd.** ("IML UK"), formerly known as International Markets Live, Ltd., is a United Kingdom company with its registered address at Floor 11, Two Snow Hill, Queensway, Birmingham, England, B4 6WR.[138] IML UK has also used 108 Village Square, #146, Somers, New York, 10589 as a mailing address.[139] Defendant Isis Terry has been the sole officer, director, and shareholder of IML UK.[140] IML has stated that IML UK is an affiliate of International Markets Live, Inc.[141] IML UK opened merchant accounts to process and receive consumers' credit card payments, including payments from U.S. consumers, to the Company.[142]

---

[135] PX25, 4608, 4558, 4608, 4656, 6371, 6743 (2nd Tyndall Decl., Atts. X, Z) (IML Interrogatory No. 1, 19 Resp., Isis Terry Interrogatory No. 24 Resp., Chris Terry Interrogatory No. 24 Resp.); PX23, 1852, 1868-73 (Graham Cordova Decl. ¶6, Atts. D, E).

[136] PX25, 4608 (2nd Tyndall Decl., Att. X) (IML Interrogatory No. 2 Resp.).

[137] PX23, 1852, 1865-73 (Graham Cordova Decl. ¶6, Atts. C-E).

[138] PX23, 1852-53, 1910-11 (Graham Cordova Decl. ¶7, Att. G).

[139] *Id*. at 1852-53, 1912-14 (Graham Cordova Decl. ¶7, Att. H).

[140] PX25, 6712 (2nd Tyndall Decl., Att. Z).

[141] *Id*. at. 4608 (2nd Tyndall Decl., Att. X) (IML Interrogatory No. 3 Resp.).

[142] *Id*. at 4896-98, 4526-28, 6006, 6091-92 (2nd Tyndall Decl., Atts. X, Z) (BlueSnap Interrogatory No. 2 Resp.); PX21, 1846-47 (Agarwal Decl. ¶¶18-19).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IML UK has commingled funds with the Company.[143]

 **Assiduous, Inc.** ("Assiduous") is a Delaware corporation that has maintained a principal place of business at 2450 St. Rose Parkway, Suite 120, Henderson, Nevada 89074.[144] Assiduous has also used 108 Village Square, #146, Somers, New York, 10589 as a mailing address.[145] International Markets Live., Inc has stated that Assiduous is an affiliate of the Company. Defendant Isis Terry has been the sole officer and shareholder of Assiduous.[146] Assiduous accepts consumers' cryptocurrency payments to the scheme on the Company's behalf, and International Markets Live, Inc. paid service fees to open a cryptocurrency payment account for Assiduous.[147] International Markets Live, Inc. employees have negotiated with a cryptocurrency payment processor on behalf of Assiduous.[148] As part of that negotiation, a Company employee represented that Assiduous was registered in Nevada as a foreign corporation doing business in the state.[149] Assiduous has commingled funds with the Company, including by transferring over $3 million to the Company.[150] A Company employee has acted as "office manager" for Assiduous, and Assiduous holds the lease for a property the Company uses in Utah.[151]

 **Global Dynasty Network, LLC** ("GDN") is a Nevada limited liability company that has maintained a principal place of business at 2450 St. Rose Parkway, Suite 120, Henderson,

---

[143] PX25, 4896-98 (2nd Tyndall Decl., Att. Z); PX21, 1846-47 (Agarwal Decl. ¶¶18-19).

[144] PX25, 4522 (2nd Tyndall Decl., Att. X) (ALT 5 Sigma Interrogatory No. 1 Resp.); *id*. at 6712 (2nd Tyndall Decl., Att. Z).

[145] *Id*. at 4932-38 (2nd Tyndall Decl., Att. Z).

[146] *Id*. at 4863, 6712.

[147] *Id*. at 4827, 4844-46, 4863.

[148] *Id*. at 4837-43; 4849-54, 4856, 4858-59.

[149] *Id*. at 4843.

[150] *Id*. at 4939.

[151] *Id*. at 4608 (2nd Tyndall Decl., Att. X) (IML Interrogatory No. 3 Resp.); *id*. at 5978 (2nd Tyndall Decl., Att. Z).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nevada 89074.[152] Defendants Jason Brown and Matt Rosa have been the sole members and

employees of GDN.[153] GDN is the corporate entity that Brown and Rosa have used to participate

in the IML Business Venture and to accept payments from the Company for amounts Rosa and

Brown have earned as IML salespeople.[154] GDN has received over $33 million from the

scheme.[155]

### B.  Individual Defendants

**Christopher Terry**, also known as Chris Terry, is the CEO and co-owner of

International Markets Live, Inc.[156] Chris Terry has signatory authority on a bank account in the

name of the Company.[157] He directed Company employees to open a bank account in the name

of Assiduous.[158] As CEO, Chris Terry has ultimate decision-making authority over all of IML's

business operations, including the Business Venture and the Training Services, and he makes

final decisions about the oversight and discipline of IML's salespeople.[159] In addition to making

deceptive earnings claims himself, he has repeatedly allowed top salespeople to make deceptive

earnings claims and has authorized large monetary bonuses for such salespeople despite

---

[152] *Id*. at 2724, 4928, 4968-70 (2nd Tyndall Decl. ¶35, Att. Z).

[153] *Id*. at 4572 (2nd Tyndall Decl., Att. X) (GDN Interrogatory No. 10 Resp.).

[154] *Id.* at 4572 (2nd Tyndall Decl., Att. X) (GDN Interrogatory Nos. 10-11 Resp.). GDN claimed in its interrogatory responses that Jason Brown does not "work[] with [IML] in an executive…position." *Id.* However, Brown has submitted multiple sworn declarations in court proceedings stating that he is a vice president of IML. *See, e.g.*, PX25, 5019-21, 5676-78 (2nd Tyndall Decl., Att. Z).

[155] PX20, 1807 (Violette Decl. ¶¶19-20).

[156] PX25, 4780, 4551, 4905 (2nd Tyndall Decl., Atts. X, Z) (Chris Terry Interrogatory No. 7 Resp.) (Chris Terry 2018 Witness Testimony Tr. at 57:8-22).

[157] PX25, 4940, 4960 (2nd Tyndall Decl., Att. Z).

[158] *Id*. at 6045 (2nd Tyndall Decl., Att. Z).

[159] PX25, 4551, 4554 (2nd Tyndall Decl., Att. X) (Chris Terry Interrogatory No. 22 Resp.).

knowledge of the deceptive claims they made.[160]

Chris Terry has communicated with payment processors about IML's high credit card chargeback rates and is aware of multiple U.S. and foreign law enforcement actions against IML.[161] He knew that Matthew Thayer, one of IML's most popular instructors, posted fake trading results and profited by referring consumers to unregulated offshore brokers.[162] He is also aware that other Company officers have advised IML salespeople on ways to evade IML's compliance program and law enforcement.[163] Chris Terry is aware of numerous consumer complaints about IML, the Training Services, and the Business Venture.[164] Together with his wife, Defendant Isis Terry, he has received at least $20 million from Defendants' scheme.[165]

**Isis Terry**, also known as Isis De La Torre, is the CFO and co-owner of International Markets Live, Inc., the sole owner and officer of IML UK, and sole owner and officer of Assiduous.[166] As CFO, Isis Terry manages all financial operations of IML, including managing IML's relationships with banks and payment processors.[167] Isis Terry is aware that IML's top salespeople make deceptive earnings claims and has access to the database IML has used to track

---

[160] *See supra*, Statement of Facts, Section I.F.i; *see also* PX17, 987-90, 999-1003, 1035, 1038, 1049 (1st Patten Decl. Atts. N, O, P); Appendix A.

[161] PX25, 4891-95, 5997, 6085, 6336-46 (2nd Tyndall Decl., Att. Z).

[162] *Id*. at 4929-31, 6333.

[163] *Id*. at 5175-86.

[164] *Id*. at 6347-48.

[165] PX25, 4559, 4653-55 (2nd Tyndall Decl., Att. X) (Chris Terry Interrogatory No. 22 Resp.; Isis Terry Interrogatory Nos. 21, 22 Resp.).

[166] PX25, 4780, 4833, 4863, 4905, 4963, 6712 (2nd Tyndall Decl., Att. Z); PX25, 4610-11 (2nd Tyndall Decl., Att. X) (IML Interrogatory Nos. 4, 5 Resp.); PX23, 1852-53, 1874-1909 (Graham Cordova Decl. ¶7, Att. F).

[167] PX25, 4610-11, 4646-47, 4653 (2nd Tyndall Decl., Att. X) (IML Interrogatory Nos. 4, 5 Resp.; Isis Terry Interrogatory Nos. 10, 21 Resp.).

those earnings claims.[168] She has signed payment processing agreements on behalf of IML and has signatory authority on bank accounts in the name of IML and Assiduous.[169] She has communicated with payment processors about IML's high chargeback rates and is aware that multiple payment processors have terminated IML's accounts or refused to open an account for IML, and that IML's merchant accounts have been repeatedly placed in credit card network monitoring programs due to high chargebacks.[170] In order to maintain IML's access to the credit card networks, and thereby to consumers' funds, Isis Terry has falsely stated in multiple applications for merchant accounts that IML's merchant accounts have not been terminated in the past.[171]

She is also aware of multiple U.S. and foreign law enforcement actions against IML, and of numerous consumer complaints about IML's Training Services and the Business Venture.[172] Isis Terry regularly attended weekly IML executive conference calls during which IML chargebacks, law enforcement actions against IML, IML salespeople's deceptive social media

---

[168] PX25, 5419-28, 5873-76 (2nd Tyndall Decl., Att. Z).

[169] PX25, 4653-55, 4960, 4963-67, 6783-88, 6802-04 (2nd Tyndall Decl., Att. X) (Isis Terry Interrogatory Nos. 21, 22 Resp.).

[170] PX25, 6014-15, 6037, 6082-83, 6085-86, 6088-89, 6094-96, 6821, 6875-76 (2nd Tyndall Decl., Att. Z). Chargebacks occur when customers contact their credit card issuing bank to dispute a charge appearing on their credit card statement. The card networks (e.g., Visa and MasterCard) have chargeback monitoring programs designed to flag merchants with excessive chargeback rates (e.g., 100 or more chargebacks in one month, and a monthly chargeback-to-transaction ratio of 0.9% or greater). Merchants placed in excessive chargeback programs are subject to additional scrutiny by the card networks, as well as possible fines and termination. High chargeback rates are an indicator of fraud. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1075-76 (C.D. Cal. 2012) *aff'd in part, vacated in part, remanded,* 815 F.3d 593 (9th Cir. 2016) (high chargeback rates are an indicator of fraud); *FTC v. Grant Connect, LLC,* 827 F. Supp. 2d 1199, 1222 (D. Nev. 2011), *aff'd in part, vacated in part*, 763 F.3d 1094 (9th Cir. 2014) (same).

[171] PX25, 5680-83, 6014-15, 6062-81 (2nd Tyndall Decl., Att. Z).

[172] *Id*. at 6041-44, 6347-48, 6796, 6875-85.

35

posts, IML's IDSs, and IML's compliance measures were discussed.[173] Together with her husband, Chris Terry, Isis Terry has received at least $20 million from Defendants' scheme.[174]

**Jason Brown** has been a Vice President of Field Operations at International Markets Live, Inc., a top salesperson for IML, and a managing member and owner of GDN.[175] Brown has made deceptive earnings claims in selling IML's Training Services and Business Venture.[176] As vice president and a close advisor of Chris Terry, Brown is aware of deceptive earnings claims made routinely by other salespeople and instructors.[177] He has discussed with Chris Terry how to handle salespeople's earnings claims and how to respond to foreign law enforcement actions.[178] To further IML's scheme, he has hired a third party, on behalf of IML, to post fake positive reviews about IML under a pseudonym.[179] He has directed IML's compliance consultant to find ways to disable the social media accounts of people who have criticized IML's practices online.[180] He has advised IML salespeople on how to post deceptive earnings claims online in ways that would evade law enforcement.[181] Brown, along with his business partner Defendant

---

[173] *Id*. at 5877-78, 6875-85.

[174] PX25, 4559, 4653-55 (2nd Tyndall Decl., Att. X) (Chris Terry Interrogatory No. 22 Resp., Isis Terry Interrogatory Nos. 21, 22 Resp.).

[175] *See* Appendix A, PX25, 5019-21, 5676-78 (2nd Tyndall Decl., Att. Z); PX25, 4572 (2nd Tyndall Decl., Att. X) (GDN Interrogatory No. 10 Resp.).

[176] PX17, 1037, 1046, 1063-66, 1125 (1st Patten Decl. Att. P); PX18, 1290 (2nd Patten Decl. Att. A); PX25, 2709, 3110-30, 5194-96 (2nd Tyndall Decl. ¶9, Atts. D, Z).

[177] PX25, 5145-53, 5187-92, 5197-5200, 6400-06 (2nd Tyndall Decl., Att. Z).

[178] *Id*. at 6158-88, 6215-45, 6336-46.

[179] PX25, 4978-79, 5022-23, 6001-05 (2nd Tyndall Decl., Att. Z).

[180] *Id*. at 6195-96, 6200, 6222.

[181] For example, in June 2020, Jason Brown wrote to other top salespeople: "I think on IG [Instagram] the young leaders have started to use the close friends feature which is great to show lifestyle but not keep it public at all…Income claims, cars, luxury and exotic lifestyle just has to stay offline." *Id*. at 6430; *see also id*. at 5147, 5198.

Rosa, has received more than $33 million from the IML scheme via payments to their company, GDN.[182] He has also received an additional $3.5 million directly from IML.[183]

**Alex Morton** has been a "Chairman Elite" and Executive Vice President of Sales for International Markets Live, Inc.[184] He has been IML's highest paid salesperson and has made deceptive earnings claims to lure consumers into the IML scheme.[185] Before joining IML, Morton was a successful salesperson for Vemma, another MLM scheme that was a defendant in an FTC law enforcement action. In issuing a preliminary injunction in favor of the FTC, the *Vemma* court quoted Alex Morton's earnings claims when determining that the FTC had met its burden to show a likelihood of success in demonstrating that Vemma made material misrepresentations.[186] Morton has continued to make deceptive earnings claims after receiving an FTC Synopsis Concerning Money-Making Opportunities from the FTC on December 9, 2022.[187] For his success in doing so, he has received over $76 million from IML.[188] He has also

---

[182] PX20, 1807 (Violette Decl. ¶¶19-20).

[183] PX21, 1842-43 (Agarwal Decl. ¶¶7-10).

[184] PX25, 4780, 6032 (2nd Tyndall Decl., Att. Z); PX24, 2244, 2625-28 (1st Tyndall Decl. ¶44, Att. RR).

[185] PX24, 2219-20, 2241, 2294-95, 2572-81(1st Tyndall Decl. ¶¶5, 39, Atts. E, CC); PX17, 921, 986, 1047-48, 1068-70, 1124, 1128-30, 1133-42, 1191-1205, 1207-12, 1218-46 (1st Patten Decl., Atts. B, N, P, S-V); PX18, 1250-64, 1360-63, 1375-79, 1381-86, 1397-1413, 1425-34, 1436-37, 1439-49 (2nd Patten Decl., Atts. A-E); PX19, 1474-93, 1547-65, 1579-97, 1779-80 (3rd Patten Decl., Atts. A-C, L-N, Q, R, UU); PX4,119-20, 146 (Gonzalez Decl. ¶17, Att. G); PX25, 2711, 3110-30 (2nd Tyndall Decl. ¶16, Att. K).

[186] *FTC v. Vemma Nutrition Company, et. al.*, Case No. 2:15-cv-01578 (D. Ariz. Sept. 18, 2015) (ECF No. 118). The *Vemma* defendants ultimately agreed to a final order barring them from operating a pyramid scheme and from making misrepresentations. *FTC v. Vemma Nutrition Company, et. al.*, Case No. 2:15-cv-01578 (D. Ariz. Dec. 21, 2016) (ECF No. 273).

[187] PX18, 1250-64, 1360-63, 1375-79, 1381-86, 1397-1413, 1425-34, 1436-37, 1439-49 (2nd Patten Decl., Atts. A-E); PX19, 1474-93, 1547-65, 1579-97, 1779-80 (3rd Patten Decl., Atts. A-C, L-N, Q, R, UU); PX24, 2252, 2572-81 (1st Tyndall Decl. ¶60, Att. CC).

[188] PX25, 6742 (2nd Tyndall Decl., Att. Z).

been the beneficiary of a contract with IML, under which he is reimbursed up to $10,000 per month for "travel and entertainment" expenses.[189]

Morton has been aware of deceptive earnings claims made by other salespeople and IML instructors.[190] He has advised top salespeople on how to post deceptive earnings claims online in ways that will evade IML's compliance program and law enforcement, and directed IML salespeople to telemarket.[191] Morton has also on numerous occasions intervened with IML's compliance staff and executive officers on issues ranging from salesforce compensation and retention to disciplinary and recruitment matters.[192] In March of 2025, Morton's counsel represented to the FTC that Morton has resigned from IML "on advice of counsel."

**Matthew Rosa**, also known as Matt Rosa, has been a top salesperson for IML and a managing member and owner of GDN.[193] As one of the most highly paid salespeople for IML, Rosa has made deceptive earnings claims, and has continued to make such claims after receiving an FTC Synopsis Concerning Money-Making Opportunities on December 9, 2022.[194] He is aware of numerous deceptive earnings claims made by other salespeople and IML instructors.[195]

---

[189] *Id*. at 4781.

[190] *Id*. at 4783-86, 6428.

[191] *Id*. at 5180; PX24, 2219-20, 2296, 2299 (1st Tyndall Decl. ¶5, Att. E).

[192] PX25, 4804-05 (2nd Tyndall Decl., Att. Z); *id.* at 5697-5700 (lobbying for payment of commission to "an up and coming" salesman); *id.* at 5694 (approving blocking salesman's account at IML); *id.*, 5692-93 (petitioning IML's Chief Operating Officer to reverse Company's prior decision affecting high-ranking salesman); *id.* at 5690-91 (requesting immediate action to make exception to Company policy for salesman); *id.* at 5695-96 (ordering suspension of Argentine salesmen).

[193] PX25, 4572 (2nd Tyndall Decl., Att. X) (GDN Interrogatory No. 10 Resp.); PX24, 2241 (1st Tyndall Decl. ¶39).

[194] PX17, 1071-73, 1184-89, 1214-17 (1st Patten Decl., Att. P); PX18, 1291-1316, 1332-34, 1336-53, 1364-73, 1388-92, 1451-65 (2nd Patten Decl., Atts. A, B, E); PX24, 2252, 2572-81 (1st Tyndall Decl. ¶60, Att. CC); PX25, 2711, 4004-47 (2nd Tyndall Decl. ¶19, Att. N).

[195] PX25, 5132, 5146-50, 5178-84 (2nd Tyndall Decl., Att. Z).

He has advised top salespeople at IML on how to post deceptive earnings claims online in ways that will evade law enforcement investigators, and has taken steps to disguise his deceptive online marketing.[196] Rosa engages in telemarketing for IML and directs IML salespeople to sell IML's services over the telephone.[197] He, along with his business partner Defendant Brown, has received more than $33 million from Defendants' scheme through payments to their company, GDN.[198]

**Brandon Boyd** has been a high-earning IML salesperson and instructor, and has received more than $5.8 million from Defendants' scheme.[199] Boyd has made deceptive earnings claims and is aware of deceptive earnings claims made by other IML salespeople and instructors.[200] Boyd received an FTC Synopsis Concerning Money-Making Opportunities in August 2024, but Boyd's social media pages continue to feature deceptive earnings claims in April 2025.[201] He has engaged in telemarketing to sell IML's services and directs IML salespeople to use deceptive earnings claims to telemarket IML's services to consumers. Boyd narrates multiple training

---

[196] *Id*. at 5150, 5178-84, 6836-37 (2nd Tyndall Decl., Att. Z) (Rosa has instructed his video producer to "[m]ake [a marketing] video [with jets and cars] private [so] you can only see when some one sends to you…TINA can't find what they can't find").

[197] PX24, 2302, 2304 (1st Tyndall Decl., Att. F).

[198] PX20, 1807 (Violette Decl. ¶¶19-20).

[199] PX25, 4544-46 (2nd Tyndall Decl., Att. X) (Brandon Boyd Interrogatory Nos. 1, 5 Resp.); PX24, 2241 (1st Tyndall Decl. ¶39).

[200] PX17, 1011-21, 1075, 1102-12, 1126 (1st Patten Decl., Atts. O, P, Q, S); PX18, 1266-87, 1374, 1435 (2nd Patten Decl., Atts. A, B, D); PX19, 1470-73, 1494-1540, 1566-71, 1649-54, 1781-90 (3rd Patten Decl. ¶¶4-5, Atts. D-J, O, AA, VV-ZZ); PX25, 2709, 3061-09, 6424-25 (2nd Tyndall Decl. ¶8, Atts. C, Z); PX24, 2220-26, 2241, 2587-90 (1st Tyndall Decl. ¶¶8-9, 39, Att. EE).

[201] *Id*. at 2220-26 (1st Tyndall Decl., ¶¶8-9).

videos teaching IML salespeople how to recruit consumers to the IML scheme, including through deceptive earnings claims, and tells them to telemarket.[202]

## IV. Consumer Injury

Defendants have taken in over $1.242 billion from consumers worldwide between January 1, 2018 and October 31, 2023.[203] During that time period, over 2,461,000 consumers have paid $1,235,480,807 to IML for the Training Services, with the median amount being $235.[204] And over 163,000 consumers paid $7,051,069 to IML in order to participate in the Business Venture and lost money, according to IML's own data.[205] More than 1,830 complaints from IML purchasers have been filed with the Better Business Bureau or the FTC.[206] As discussed above, a survey of purchasers of the Training Services shows that the vast majority of them do not generate the substantial earnings that IML advertises, most make little or nothing at all, and a large number lose money.

## ARGUMENT

### I. The FTC Act and the Nevada Revised Statutes Authorize the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Court to issue an injunction against violations of any laws enforced by the FTC and "any ancillary relief necessary to accomplish complete justice." *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994)). This ancillary relief can include a preliminary injunction. *See, e.g.*, *FTC v. Affordable Media, LLC*, 179 F.3d 1228,

---

[202] PX23, 1855, 2069, 2084-86 (Graham Cordova Decl. ¶10-12, Atts. AC, AE); PX24, 2221-25, 2306-10 (1st Tyndall Decl. ¶¶8-9, Att. G).

[203] PX20, 1803-05 (Violette Decl. ¶¶11-14).

[204] *Id*. at 1803-04 (Violette Decl. ¶¶11-12).

[205] *Id*. at 1805 (Violette Decl. ¶14).

[206] PX24, 2243 (1st Tyndall Decl., Att. A).

1232 & n.2 (9th Cir. 1999) (TRO and preliminary injunction); *FTC v. Am. Nat'l Cellular, Inc.*,

810 F.2d 1511, 1512 (9th Cir. 1987) (TRO and preliminary injunction).

 *AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67 (2021) held that the FTC is not able to

obtain equitable monetary relief under Section 13(b) of the FTC Act, but this action is brought

under both Sections 13(b) and 19. Section 19 authorizes relief "necessary to redress injury to

consumers," including "rescission or reformation of contracts, [and] the refund of money or

return of property," for violations of FTC trade regulation rules—here, the Telemarketing Sales

Rule and ROSCA.[207] Freezing assets and appointing a receiver are "forms of relief that can be,

and often are, 'necessary to redress injury to consumers.'" *FTC v. Simple Health Plans LLC*, 58

F.4th 1322, 1329 (11th Cir. 2023) (quoting Section 19 and upholding preliminary injunction with

asset freeze and receiver under that section, based upon the TSR). Numerous district courts in the

Ninth Circuit and throughout the nation have granted injunctive relief like the relief sought here,

premised upon an FTC rule, including in enforcement actions brought after *AMG*.[208]

---

[207] 15 U.S.C. § 57b(b). A violation of ROSCA is a "a violation of a rule under section 18 of the [FTC Act, 15 U.S.C. § 57a,] regarding unfair or deceptive acts or practices." 15 U.S.C. § 8404(a). Section 19 of the FTC Act provides that the FTC may obtain monetary relief for rules promulgated under Section 18 of the FTC Act. 15 U.S.C. § 57b(a)(1), (b).

[208] *See, e.g.*, *FTC v. Superior Servicing, LLC*, Case No. 24-cv-2163-GMN-MDC (D. Nev. Decl. 6 and 19, 2024) (ECF Nos. 30 and 42) (PI; asset freeze against individual and corporate defendant, and receiver); *FTC v. Ascend Capventures Inc.*, No. 2:24-cv-07660-SPG-JPR (C.D. Cal. Sept. 13, 2024) (ECF No. 30) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, and expedited discovery); *FTC v. Automators LLC,* No. 3:23-cv-01444-BAS-KSC (C.D. Cal. Aug. 11, 2023) (ECF No. 8) (granting, post *AMG, ex parte* TRO with conduct prohibitions, asset freeze, appointment of monitor, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. Vision Online, Inc.,* No. 6:23-cv-01041 (M.D. Fla. June 7, 2023) (ECF No. 11) (granting, post *AMG, ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. BCO Consulting Servs. Inc.,* No. 8:23-cv-00699-JWH(ADSx) (C.D. Cal. May 3, 2023) (ECF No. 32) (granting, post *AMG, ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. SL Fin. LLC,* No. 8:23-cv-00698-JWH(ADSx) (C.D. Cal. May 2, 2023) (ECF No. 23) (same); *FTC v. Graham,* No. 3:22-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Furthermore, the State of Nevada is seeking injunctive and monetary relief under Nev. Rev. Stat. § 598.0963, which authorizes the Nevada Attorney General to obtain restitution for deceptive trade practices.

In determining whether to grant the preliminary relief sought here, the Court must consider two factors: (1) the Plaintiffs' likelihood of ultimate success, and (2) whether the public equities outweigh any private equities. *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1212-14 (9th Cir. 2019); *Affordable Media*, 179 F.3d at 1233 (noting "a lighter burden" under Section 13(b) "than that imposed on private litigants by the traditional equity standard") (quoting *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)).[209] Unlike private litigants, the FTC does not need to prove irreparable injury. *Consumer Def.*, 926 F.3d at 1212 (quoting *Warner Commc'ns, Inc.*, 742 F.2d at 1159); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). Because irreparable injury is presumed, the Court "need only . . . find some

cv-00655-MMH-JBT (M.D. Fla. June 21, 2022) (ECF No. 19) (same); *FTC v. Rando,* No. 3:22-cv-00487-TJC-MCR (M.D. Fla. May 3, 2022) (ECF No. 12) (same); *FTC v. Noland,* No. CV-20-00047-PHX-DWL, 2021 WL 4318466, at *6 (D. Ariz. Sept. 23, 2021) (affirming validity of *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery that was issued in 2020 but challenged after *AMG,* because complaint alleged violations of Section 19).

[209] Plaintiffs also meet the traditional four-part equity standard for a preliminary injunction. First, Plaintiffs have shown that they are likely to succeed on the merits (*see* Argument, Section II.A). Second, Plaintiffs and consumers will suffer irreparable injury if the Court denies the preliminary injunction. Consumers have paid and are paying hundreds or thousands of dollars based on Defendants' material misrepresentations. In the aggregate, consumers have lost in excess of $1 billion to Defendants' ongoing scheme. Defendants have both dissipated corporate assets and taken steps to place their assets outside the jurisdiction of the United States. When it may be difficult or impossible to recover a money judgment against a defendant, courts have found irreparable injury. *See, e.g., Tri-State Generation & Trans. Ass'n., Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986). Third, the threatened injury to consumers outweighs any injury to Defendants. Defendants can continue in their business; they just need to preserve their assets and comply with the law and the monitor's directions. Fourth, the proposed preliminary relief serves the public interest in stopping law violations and preserving funds for consumer redress.

1

2

3

4

5

chance of probable success on the merits" in order to award preliminary relief. *World Wide Factors*, 882 F.2d at 347 (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987)). Moreover, when weighing the equities, the public interest should receive greater weight than private interests. *Id.*

6

**II. The Proposed Preliminary Injunction Order is Appropriate and Necessary**

7

8

The evidence shows that Plaintiffs are likely to succeed on their respective claims, and the equities weigh heavily in favor of the requested preliminary relief.

9

**A.  Plaintiffs Are Likely to Succeed on the Merits**

10

**i.  Defendants Violate Section 5(a) of the FTC Act (Counts I-III)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Section 5(a) of the FTC Act empowers the FTC to prevent "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Defendants' conduct is deceptive. "An act or practice is deceptive if first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (quoting *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001)). A misrepresentation may be either express or implied. *FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 604 (9th Cir. 1993). A representation is likely to mislead consumers if (1) the express or implied message conveyed is false, or (2) the maker of the representation lacked a reasonable basis for asserting that the message was true. *Pantron I*, 33 F.3d at 1096; *see also FTC v. Lights of Am., Inc.*, No. SACV10-01333JVS (MLGx), 2013 WL 5230681, at *44 (C.D. Cal. Sept. 17, 2013) (holding defendants liable for claims made without adequate substantiation). Where the maker lacks adequate substantiation evidence, the maker necessarily lacks any reasonable basis for its claims. *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010).

26

27

28

In determining whether a representation is likely to mislead consumers, courts consider the overall "net impression" it creates. *Stefanchik*, 559 F.3d at 928. Claims of "potential" or

43

"projected" earnings or rewards, like those made by Defendants, state or at a minimum imply that such earnings are representative of what many consumers have achieved. *See FTC v. Vemma Nutrition Co.*, No. CV-15-01578-PHX-JJT, 2015 WL 11118111 at *6 (D. Ariz. Sept. 18, 2015); *FTC v. Five-Star Auto Club*, *Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

A representation, omission, or practice is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *In re Cliffdale Assocs.*, 103 F.T.C. 110, 165, 1984 WL 565319 (F.T.C. 1984)). If consumers are likely to have chosen differently but for the deception, then a misrepresentation is material. *In re Sw. Sunsites, Inc.*, 105 F.T.C. 7, 99-101, 1985 WL 668880, *aff'd*, 785 F.2d 1431 (9th Cir. 1986). Express claims are presumed to be material, as are claims that go to the central characteristics of a product or service. *Pantron I Corp.*, 33 F.3d at 1095-96; *Lights of Am.*, 2013 WL 5230681, at *41. Defendants' claims are express, they go to the core features of the Training Services and the Business Venture, or both. Consumer reliance is presumed if defendants made material misrepresentations that were widely disseminated and consumers purchased the defendant's product. *Figgie Int'l*, 994 F.2d at 605-6. The Individual Defendants have made material misrepresentations and are liable for those misrepresentations. In addition, Defendants Chris and Isis Terry, Alex Morton, and Jason Brown have the requisite control over IML, as corporate officers, to be held personally liable for IML's misrepresentations.[210]

"Under the FTC Act, a principal is liable for the misrepresentations of his agent acting within the scope of the agent's actual or apparent authority." *Stefanchik*, 559 F.3d at 930. And a principal is bound by the acts of its salespeople, if within the actual or apparent scope of their authority; even when the actions are unauthorized. *FTC v. Johnson*, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015) (quoting *Goodman v. FTC*, 244 F.2d 584, 592 (9th Cir. 1957)). Factors

_____

[210] *See infra*, Statement of Facts, Section III.B.

1
2
3
4
5
6
7
8
9
10
11
12
13

establishing that a salesperson is an agent of a company include the salesperson's use of a company's name, the company retaining control over the use of its marketing materials, and consumers perceiving the salesperson and the company as a "seamless operation." *Stefanchik*, 559 F.3d at 930-31.[211] Establishing a compliance monitoring program does not absolve a principal from liability for its agents' conduct. *Johnson*, 156 F. Supp. at 1207. As discussed above in the Statement of Facts, Section I.E, IML's salespeople are Company agents: they act under the apparent or actual authority of IML.[212] Defendants—both directly, and through their agent salespeople—widely disseminate misrepresentations on social media platforms (e.g., Instagram, YouTube, Facebook and TikTok), and through encrypted communications apps (e.g., Telegram, WhatsApp).

---

14
15
16
17
18
19
20
21
22
23
24

[211] Defendants may cite to *FTC v. Neora LLC,* Civil Action No. 3:20-cv-01979-M, 2023 WL 8446166 (N.D. Tex. Sept. 28, 2023) to argue that IML's salespeople are not its agents. The *Neora* decision, however, is inapposite. The court concluded that Neora afforded its "Brand Partners" flexibility in how they operated, and there was simply insufficient evidence to establish that Neora's "Brand Partners" operated their businesses "in similar enough ways as to support the Court making a global pronouncement of apparent authority." *Id*. at *26. Here, as discussed in the Statement of Facts, Sections I. C, E, and F, IML CEO Chris Terry, Vice President Jason Brown and Executive Vice President for Sales Alex Morton are in constant communication with top salespeople at IML, and IML exercises a great deal of control over how all IBOs operate— limiting the use of the Company's name, directing them on how to market the services, and exhorting them to engage in telemarketing. Even the *Neora* court, in a later ruling, observed that the decision concerning agency could have been decided in the FTC's favor. *FTC v. Neora LLC*, No. 3:20-cv-01979-M, 2024 WL 3414347, at *3, n.7 (N.D. Tex. May 29, 2024) ("the Court determines that the FTC's position on the agency issue was, in fact, reasonable… The FTC relied on accepted legal theories of actual and apparent authority in support of its position, and other courts have found an agency relationship in multilevel marketing distributorship cases similar to the circumstances presented here…evidence [regarding high-level Brand Partners] could have thus satisfied a different reasonable factfinder.").

25
26
27
28

[212] While IML did prohibit the use of the scheme's name in social media posts, in order to evade law enforcement, IML never forbade salespeople from using the name while telemarketing or at live events. And consumers understood that IML salespeople were "representatives" of or "leaders" of the Company. *See, e.g.*, PX4, 116 (Gonzalez Decl. ¶4); PX9, 172 (Decema Decl. ¶¶3, 4); PX6, 153 (Dusold Decl. ¶9); PX13, 296 (Salinas Decl. ¶¶2, 3).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The FTC is therefore likely to prevail on Counts I and II of the Complaint, which allege that Defendants have violated Section 5 by misrepresenting how much consumers will or are likely to make with Defendants' Training Services and Business Venture.[213] As described above, Defendants—both directly and through their agent salespeople—falsely tell consumers that they can expect to earn substantial returns by purchasing the Training Services and participating in the Business Venture. Defendants know that have no basis for their earnings claims. Further, purported disclaimers that can be located through a small hyperlink to the "Terms of Use" at the bottom of Defendants' websites are inconspicuous, in small font, and do not diminish the impact of Defendants' deceptive and material earnings claims. *See Cyberspace.com*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.").

The FTC is also likely to prevail on Count III of the Complaint, which alleges that Defendants made related misrepresentations about consumers' ability to make money, including that consumers could make significant returns without expending much time, effort, or money, and that Defendants' instructors are audited by the FTC. As shown above, Defendants tell consumers that any consumer can use the Training Services to earn income, that consumers can do so without significant investable capital or significant free time, and hold out IML's "instructors" as wealthy traders whose success—audited by the FTC—demonstrates that the Training Services work. These false or misleading claims are presumed material because they are express, go to the central characteristics of the product, or both.

---

[213] While there is ample evidence that IML's salespeople are the Company's agents (*see supra*, Statement of Facts, Section I.E), the deceptive earnings claims made solely by the Defendants in this matter would be sufficient to establish that the FTC is likely to prevail on Counts I-III.

1

### ii. Defendants Violate the TSR (Count IV)

2   Defendants are "sellers" and "telemarketers" engaged in "telemarketing" as defined by

3 the TSR, and they deceptively sell their products and services to consumers by telephone.[214] The

4 Training Services and Business Venture are "Investment opportunity[ies]" as defined by the

5 TSR. 16 C.F.R. § 310.2(s). The TSR defines an "Investment opportunity" as "anything, tangible

6 or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on

7 representations, either express or implied, about past, present, or future income, profit, or

8 appreciation." *Id*. It bars sellers and telemarketers from "[m]isrepresenting, directly or by

9 implication, in the sale of goods or services. . . [a]ny material aspect of an investment

10 opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability." *Id*. §

11 310.3(a)(2)(vi).

12

13   The TSR prohibits sellers and telemarketers from: (1) "[m]isrepresenting, directly or by

14 implication, in the sale of goods or services … [a]ny material aspect of the performance,

15 efficacy, nature, or central characteristics of goods or services that are the subject of a sales

16 offer," and from (2) "[m]aking a false or misleading statement to induce any person to pay for

17 goods or services. . ." *Id*. § 310.3(a)(2)(iii); § 310.3(a)(4). Because Defendants' Training

18

19

20

21

---

[214]The TSR defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(ee). The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." *Id*. § 310.2(hh). The TSR defines "telemarketing," in relevant part, as "a plan, program, or campaign which is conducted to induce the purchase of goods or services …, by use of one or more telephones and which involves more than one interstate telephone call." *Id*. § 310.2(ii). IML salespeople are telemarketers, as discussed above in the Statement of Facts, Section I.C. Because IML engaged in telemarketing and is part of a common enterprise with the other Corporate Defendants, all are responsible for the telemarketing violations. *See FTC v. Nudge, LLC*, 430 F. Supp. 3d 1230, 1241 (D. Utah 2019).

47

Services and Business Venture are "Investment opportunity[ies]" as defined by the TSR, the TSR applies to both calls initiated and received by consumers who purchase IML's services.[215]

As discussed in the Statement of Facts, Section I.C, *supra*, Defendants' salespeople sell their bogus services through telephone calls, on which consumers are told they will or are likely to make substantial earnings if they purchase the Training Services and participate in the Business Venture. Defendants enter into agreements with IML's salespeople under which the salespeople are authorized to conduct the telemarketing and sales of IML's services. IML retains authority to review and approve all marketing materials and decide which services are sold. And Defendant Brown and IML's former Chief Marketing Officer received a sales guide by a top IML salesperson that contained deceptive telemarketing scripts. *See Stefanchik*, 559 F.3d at 930 (affirming that defendants were "sellers" under the TSR under similar circumstances). The FTC is therefore likely to succeed on Count IV.

### iii.    The ROSCA Defendants Violate ROSCA (Count V)

The ROSCA Defendants (IML, Chris Terry and Isis Terry) have violated Sections 8403(1) and (2) of ROSCA. 15 U.S.C. § 8403. In relevant part, ROSCA prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the TSR, 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumers' billing information and (2) obtains the consumer's express informed consent before making the charge.[216]

---

[215] The TSR applies to "[c]alls initiated by a customer or donor in response to an advertisement relating to investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or advertisements involving offers for goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4). . ." *Id*. § 310.6(b)(5)(i).

[216] *See* 15 U.S.C. § 8403. The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure

1
2
3
4
5
6

As described above in the Statement of Facts, Section I.D, the ROSCA Defendants fail to clearly and conspicuously disclose multiple material terms about the Training Services, including that they "provide no guarantee" that consumers "will earn any money or achieve a financial goal" using the Training Services; and that "[t]he potential for earnings is totally dependent on the person using our site, products, services, methods and ideas."[217]

7
8
9
10
11
12
13
14
15
16

"Clear and conspicuous" disclosures are disclosures that a reasonable consumer would notice and understand. *Barrer v. Chase Bank United States, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009). The ROSCA Defendants' disclosures do not meet this test. Instead, the material "Terms" are set out in an easily-overlooked page of Defendants' website, reachable by scrolling to the bottom of Defendants' lengthy main webpage and clicking on a small hyperlink. The specific material terms are located within a lengthy document, which consumers have not been required to read before purchasing. Under similar circumstances, a court in this District found such disclosures to be inadequate. *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-RFB-GWF, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015).

17
18
19
20
21
22

The ROSCA Defendants also fail to obtain consumers' express informed consent before charging them for the Training Services. The *Health Formulas* court found that failure to make the statutorily required disclosures meant that the defendants in that case "often do not obtain consumers' express informed consent before charging their cards or accounts," violating ROSCA. *Id.*; *see also FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1321 (W.D. Wash. 2024). The FTC is therefore likely to succeed on Count V.

23
24
25
26
27
28

---

to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

[217] *See* Statement of Facts, Section I.D, *supra.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

#### iv.    Defendants Violate the Nevada Revised Statutes (Counts VI-X)

Pursuant to Nev. Rev. Stat. § 0.039, each of the Defendants is a "person" subject to compliance with, and remedies for violating, the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq*. (the "Nevada DTPA"). The Nevada DTPA also clarifies that "sales" subject to the Nevada DTPA include "attempt[s] to sell any property for any consideration," Nev. Rev. Stat. § 598.094, and "property" is broadly defined to include "intangible property or services." Nev. Rev. Stat. § 598.0937.

Claims brought under the Nevada DTPA need only be proven by a preponderance of the evidence. *Betsinger v. D.R. Horton, Inc.*, 126 Nev. 162, 166 (Nev. 2010). While many provisions in the Nevada DTPA define deceptive trade practices as acts or omissions that a defendant "knowingly" engages in, a knowing act or omission "does not require that the defendant intend to deceive with the act or omission, or even know of the prohibition against the act or omission, but simply that the defendant is aware that the facts exist that constitute the act or omission." *Poole v. Nev. Auto Dealership Invs., LLC*, 135 Nev. 280, 286-87 (Nev. Ct. App. 2019).

Counts VI through VIII of the complaint allege that all Defendants have, in distinct ways, violated Nev. Rev. Stat. § 598.0915(5) by making multiple false representations as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease. These claims under the Nevada DTPA concern Defendants' misrepresentations regarding the characteristics, uses and benefits of the Defendants' Training Services and Business Venture, and mirror the FTC's claims for violations of the FTC Act.

Accordingly, the State of Nevada is likely to prevail on Counts VI through VIII for the same reasons the FTC is likely to prevail on Counts I through III of the Complaint. Succinctly, Plaintiffs will show that (i) Defendants falsely tell consumers that they can expect to earn substantial returns by purchasing the Training Services and participating in the Business Venture, (ii) Defendants know that have no basis for their earnings claims, and (iii) Defendants

made related misrepresentations about consumers' ability to make money, including that consumers could make significant returns without expending much time, effort, or money, and that Defendants' instructors are wealthy traders whose success purportedly demonstrates that the Training Services work.

Count IX of the complaint alleges that all Defendants have violated Nev. Rev. Stat. § 598.0923(1)(c) by knowingly violating a state or federal statute or regulation relating to the sale of services. Essentially, this provision of the Nevada DTPA makes each violation of the FTC Act or the TSR a violation of the Nevada DTPA as well. Accordingly, for the same reasons the FTC is likely to prevail on its claims under the FTC Act and TSR, the State of Nevada is likely to prevail on Count IX.

Finally, Count X of the complaint alleges that the ROSCA Defendants have further violated Nev. Rev. Stat. § 598.0923(1)(c) by knowingly violating Section 4 of ROSCA, 15 U.S.C. § 8403, as described in Section II(A)(iii) of the Argument above. Each ROSCA violation constitutes a violation of the Nevada DTPA as well, and the State of Nevada is likely to prevail on Count X for the same reasons the FTC is likely to prevail on its ROSCA claims.

###### v. Corporate Defendants Are Subject to Joint and Several Liability as a Common Enterprise

The Corporate Defendants have operated as a common enterprise and thus "each may be held liable for the deceptive acts and practices of the others." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) (citing *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010) (corporate entities shared resources, staff, funds, ownership and management)); *see also FTC v. Johnson,* 156 F. Supp. 3d at 1207-08; *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) ("maze of interrelated companies"). As shown in the Statement of Facts, Section III, above, IML, IML UK, and Assiduous are commonly owned by Defendant Isis Terry, and are controlled by the Individual Defendants. IML directly operates the scheme, and Assiduous and IML UK funnel consumer funds to IML. GDN has been used by Defendants

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brown and Rosa to channel funds earned from IML to Brown and Rosa's personal accounts. IML and IML UK have used the same Somers, NY address, and IML, Assiduous, and GDN have used the same Henderson, NV address. IML, GDN, and Assiduous share employees and Assiduous holds the lease for a property IML uses in Utah.[218] The Corporate Defendants intermingle finances, transferring millions of dollars in the process, and they operate for a common, singular purpose: furthering the IML scheme. Each of the Corporate Defendants is therefore liable for the total injury caused by the scheme.

### vi.   The Individual Defendants Are Personally Liable

The Individual Defendants are liable for injunctive and monetary relief because, as shown above (*see* Statement of Facts, Section III.B), they directly participated in or had control over IML's deceptive marketing, and knew of, or at minimum recklessly disregarded, the false, misleading, and unsubstantiated nature of the claims.[219] IML CEO Chris Terry and IML CFO Isis Terry wholly own and control IML.[220] The Terrys have made unlawful earnings claims themselves and are well aware that IML salespeople have been making unlawful earnings claims

---

[218] IML UK does not appear to have any employees.

[219] An individual defendant is liable (1) for injunctive relief if he directly participated in the unlawful acts or had some control over the acts, and (2) for monetary relief if he also possessed actual or constructive knowledge of the unlawful acts. *Network Servs.*, 617 F.3d at 1138-39; *FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1170-71 (9th Cir. 1997).

[220] "Status as a corporate officer is sufficient to establish individual liability." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1080 (C.D. Cal.2012) (granting summary judgment for FTC) (citing *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989), overruled on other grounds by *FTC v. Credit Bureau Center, LLC*, 937 F.3d 764 (7th Cir. 2019)), *aff'd*, 644 Fed. Appx. 709 (9th Cir. 2016); *J.K. Publ'ns*, 99 F. Supp. 2d at 1204 ("[S]tatus as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control."); *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994) ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.").

for years, including through telemarketing.[221] The Terrys, in their capacity controlling IML, also control how the Company deceptively charges consumers on a negative option basis, violating ROSCA. Chris Terry has repeatedly rewarded high-earning IML sales leaders with lucrative commissions despite those leaders repeatedly making deceptive earnings claims.[222] Jason Brown and Alex Morton, as both high-level sales leaders and IML executives, have made unlawful claims themselves and have advised other sales leaders on how to continue to make such claims without attracting the attention of law enforcement.[223] And Matt Rosa and Brandon Boyd have been highly compensated IML sales leaders who have continued to make deceptive earnings claims after receiving the FTC Synopsis Concerning Money-Making Opportunities.[224] Brown, Morton, Rosa, and Boyd have all directed salespeople to use telemarketing to sell IML's services to consumers. They are all therefore personally liable, jointly and severally, for the total injury caused by the IML scheme. *Commerce Planet*, 815 F.3d at 600.

---

[221] *See, e.g.*, PX17, 987-90, 999-1003, 1035, 1038, 1049 (1st Patten Decl., Atts. N, O, P); PX24, 2256 (1st Tyndall Decl., Att. A) (Chris Terry states: "in my career I've earned over $150 million from the markets themselves…So each one of you here has the ability to be a multi-million-dollar earner per year, hands down."); PX23, 1854-55, 1936-39 (Graham Cordova Decl. ¶9, Att. N) (Isis Terry states "IML is offering an amazing Opportunity to any person…IML is about educating and teaching people a career that will stay with them for life, that will provide them another source of income, and that will allow them to diversify their income stream."). *See also supra*, 19-22, 33-36.

[222] *See supra*, 19-22.

[223] *See supra*, Statement of Facts, Section III.B, and 23.

[224] The knowledge element is satisfied if the individual was recklessly indifferent to the possibility the business was fraudulent or was aware of a high probability that the business was engaged in fraud and intentionally avoided learning the truth. *Network Servs.*, 617 F.3d at 1138-39. A showing that an individual has willfully ignored warning signs can meet this standard. *Id.* at 1141 (finding reckless indifference for ignoring "numerous warning signs" including "multiple customer complaints" and "suspicious financial practices"). For example, "awareness of consumer complaints is sufficient to establish" knowledge. *Lights of Am.*, 2013 WL 5230681, at *50.

**B. The Equities Weigh in The Public's Favor**

"[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *Affordable Media*, 179 F.3d at 1236 (quoting *World Wide Factors*, 882 F.2d at 347). The public interest in this case is compelling— halting unlawful and injurious conduct and preserving assets for restitution to injured consumers. Defendants, by contrast, have no legitimate interest in continuing to harm consumers.[225] Based on the evidence before the Court, Plaintiffs are likely to succeed on the merits, and the equities tip decidedly in the public's favor. Thus, a PI is warranted.

**C. The Proposed Injunctive Relief is Appropriate**

Plaintiffs have filed this action to permanently halt Defendants' unlawful conduct and to obtain redress for their victims. The proposed PI would put an immediate stop to IML's deceptive earnings claims, bar Defendants from hiding or dissipating assets that should be returned to defrauded consumers, and impose tailored limitations on their ability to spend money. Preliminary relief is necessary because Defendants' actions show that nothing short of a court order will change their behavior. Since 2018, IML has been the subject of numerous foreign law enforcement actions and warnings, media exposés, a consumer watchdog action, and has received over 650 consumer complaints.[226] Defendants have received multiple civil investigative demands from the FTC, and the FTC Synopsis Concerning Money-Making Opportunities. Despite all this, Defendants have continued to use deceptive claims to sell the Training Services and Business Venture. And they have instructed their salesforce on how to

---

[225] *See World Wide Factors*, 882 F.2d at 347 ("no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment" (quotation marks omitted)).

[226] *See supra*, 18-19.

continue to engage in deceptive conduct while evading law enforcement oversight.[227] Plainly, Defendants will not stop the fraud themselves—this Court must.

To protect consumers and preserve the possibility of effective final relief, including restitution to the consumers who have collectively lost over a billion dollars to Defendants' fraud, the proposed PI would, *inter alia*: (1) prohibit the use of deceptive earnings claims; (2) preserve the Defendants' assets and records; (3) appoint a monitor over the Corporate Defendants; and (4) require Defendants to record all IML sales events and social media posts. Because the FTC is likely to succeed in showing that the Individual Defendants are personally liable for monetary relief, an asset preservation order should issue against them as well as the Corporate Defendants. *See supra* note 207 at 41 (collecting cases issuing and affirming such relief).

Plaintiffs seek restitution for the victims of Defendants' scheme. To preserve the possibility of such relief, Plaintiffs ask the Court to preserve Defendants' assets and to order an immediate accounting to prevent concealment or dissipation of assets pending a final resolution. An asset freeze is appropriate once the Court determines that the Plaintiffs are likely to prevail on the merits of their claims and that the refund of money would be an appropriate final remedy. "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Courts have found a strong likelihood that a defendant's assets will be dissipated during the pendency of a case where the business is permeated by fraud. As the Ninth Circuit has observed in upholding an asset freeze, an individual who has "impermissibly awarded himself" funds that are not rightfully his "is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment." *Id.*

---

[227] *See supra*, 22-25.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, an asset freeze against the Corporate Defendants and an asset preservation order as to the Individual Defendants will preserve the status quo, ensuring funds that have not already been dissipated by the Individual Defendants are available for consumer redress. The asset freeze against the Corporate Defendants will be limited in nature. This limited asset freeze will allow IML to continue to serve its customers and remain a going concern. For example, it permits the Company to continue to pay its employees (including IBOs and instructors) as well as pay reasonable business expenses (e.g., employer share of existing employee health insurance benefits) and tax obligations.[228] Likewise, the asset preservation order offers the Individual Defendants a measure of flexibility. It permits unfettered spending up to a limit of $75,000 per Individual Defendant while prohibiting the transfer of assets outside the United States. And it provides Individual Defendants the ability to petition the Court for the authority to spend monies above that $75,000 limit.

The evidence demonstrates that Defendants have defrauded consumers of more than $1.242 billion since 2018. Without an asset freeze, the continued dissipation of assets is likely. Evidence shows that the Terrys use IML bank accounts to fund extravagant lifestyles: corporate accounts paid for a private chef, a yacht, luxury cars, and even a private plane.[229] And Chris Terry has boasted that he keeps cryptocurrency funds on a "cold wallet" to avoid "regulations" and "taxes."[230] Defendant Morton has set up a trust in order to "protect[]" himself from

---

[228] IML's ability, however, to make such payments is not without oversight. Payments above $10,000 per month to a single payee require the Monitor's approval.

[229] PX25, 4648-49 (2nd Tyndall Decl., Att. X) (Isis Terry Interrogatory No. 13 Resp.). The FTC's forensic accountant found that the Terrys transferred over $15 million from the IML corporate accounts for yachts, aircraft, and automobiles. PX21, 1845-46 (Agarwal Decl. ¶¶16-17).

[230] PX25, 6125 (2nd Tyndall Decl., Att. Z) (Chris Terry wrote to an IML instructor: "When u make $$ in crypto...Only u and god know...Bypass regulations [and] taxes...Am sitting on $50m still took over 65m out...But imagine...Making fortunes no taxes...Off grid.").

1
2
3
4
5
6
7

"lawsuits."[231] And he has invested significant sums in several fraudulent investment vehicles.[232] Under these circumstances, a limited asset freeze for the Corporate Defendants and an asset preservation order for the Individual Defendants strikes the appropriate balance in allowing for IML to continue to operate while protecting the funds derived from Defendants' illegal activities, preventing Defendants' continued misuse of consumers' money, and preserving the Court's ability to provide effective relief for consumers.

8
9
10
11
12
13

Appointing a monitor is critical. Defendants' actions demonstrate that they are not willing to operate their business in a lawful manner.[233] As discussed above, Defendants actively sought to evade law enforcement review of their deceptive earnings claims. In this circumstance, a monitor is needed to ensure that IML does not continue to harm consumers while this action is pending. The monitor will also help ensure that the Corporate Defendants do not dissipate their

14
15

[231] PX25, 4788 (2nd Tyndall Decl., Att. Z).

16
17
18
19
20
21
22
23
24

[232] For example, in a chat message exchange with a friend, Mike Sims, Mr. Morton noted that he lost $50,000 in an investment in "Oremus Coin" – a cryptocurrency. PX25, 4797 (2nd Tyndall Decl., Att. Z). In March 2022, the U.S. Securities and Exchange Commission charged two individuals "with defrauding thousands of retail investors out of more than $124 million through two unregistered fraudulent offerings of securities involving a digital token called 'Ormeus Coin.'" https://www.sec.gov/newsroom/press-releases/2022-37. Mr. Morton went on to invest with Mr. Sims in an investment vehicle called "Traders Domain." In September 2024, the CFTC filed a civil action against several entities and individuals (including Mr. Sims) relating to Traders Domain and making "material fraudulent representations to their customers and misappropriat[ing] customer funds." https://www.cftc.gov/PressRoom/PressReleases/8997-24. In his chat message exchange with Mr. Sims, Mr. Morton stated that "I've got half a mil in another trader doing pretty good." PX25, 4797 (2nd Tyndall Decl., Att. Z). Such activities also call into doubt the veracity of Mr. Morton's interrogatory response that his "investments in securities are limited to long term investments in mutual funds and similar holdings." *Id*. at 6887 (Morton Req. for Doc. No. 25 Supp. Resp.).

25
26
27
28

[233] Courts have installed monitors in prior FTC actions to ensure defendants' compliance with the law, while not imposing unnecessary burdens on defendants or the conduct of legitimate business. *See, e.g.*, *FTC v. Vision Online, Inc.*, No. 6:23-cv-01041 (M.D. Fl. June 7, 2023) (ECF No. 11); *FTC v. OTA Franchise Corp., et al.*, No. 8:20-cv-00287 (C.D. Cal. April 2, 2020) (ECF No. 130); *FTC v. Zurixx, LLC, et al.*, No. 2:19-cv-00713 (D. Utah Oct. 1, 2019).

1
2  ill-gotten gains by identifying their assets and records; he may also help determine the full extent
3  of the fraud.

4                                    **CONCLUSION**

5           Plaintiffs ask the Court to halt the unlawful practices of a scheme that has defrauded

6  consumers of over a billion dollars. Plaintiffs already have marshaled evidence demonstrating

7  that they will likely succeed on the merits at trial. Preliminary relief is necessary to prevent

8  continued harm to the public and preserve assets to ensure effective relief. For the forgoing

9  reasons, Plaintiffs request that the Court enter the proposed PI.

10                   Respectfully submitted,

11
12  Dated: May 30, 2025
                                      THOMAS M. BIESTY
13                                    LAURA C. BASFORD
                                      J. RONALD BROOKE, JR.
14                                    JOSHUA A. DOAN
                                      Federal Trade Commission
15                                    600 Pennsylvania Ave., NW, CC-6316
                                      Washington, D.C. 20580
16                                    (202) 326-3043 (Biesty)
                                      (202) 326-2343 (Basford)
17                                    (202) 326-3484 (Brooke)
                                      (202) 326-3187 (Doan)
18                                    Email: tbiesty@ftc.gov; lbasford@ftc.gov;
19                                    jbrooke@ftc.gov; jdoan@ftc.gov

20
21                                    Attorneys for Plaintiff
                                      FEDERAL TRADE COMMISSION
22
23
24
25
26
27
28
                                           58

1      AARON D. FORD
         Attorney General

2

3      ERNEST D. FIGUEROA
         Consumer Advocate

4

5      LUCAS J. TUCKER

6      SAMANTHA B. FEELEY
         Office of the Nevada Attorney General

7      8945 West Russell Road, Suite #204
         Las Vegas, NV 89148

8      (702) 486-3256 (Tucker)
         (702) 486-3789 (Feeley)

9      Email: ltucker@ag.nv.gov; sfeeley@ag.nv.gov

10

11     Attorneys for Plaintiff State of Nevada

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                           59

**Appendix A: Selected Top IML Salespeople's Earnings Claim Violations**

| Salesperson Name | Number of Times Deceptive Earnings Claims Reported to IML[i] | Total IML Paid to Salesperson[ii] |
|---|---|---|
| Alex Morton | 6 | $76,286,886 |
| Ivan Tapia (Mejor Vida and Emprendedores) | 7 | $40,473,337 |
| Jason Brown/Matt Rosa (Global Dynasty Network, LLC) | 8 (3 for Brown, 5 for Rosa) | $33,144,125 |
| David Imonitie | 10 | $30,322,231 |
| Bryce Thompson | 6 | $13,148,632 |
| Julian Kuschner | 3 | $7,837,566 |
| Austin Godsey | 9 | $6,374,567 |
| Darwin Lopez | 12 | $5,841,962 |
| Brandon Boyd | 7 | $5,820,598 |
| Garrett Roberts | 8 | $4,375,860 |
| Joshua Stewart | 7 | $4,335,205 |
| German Castelo Muzquiz | 3 | $3,715,816 |
| Branden Thompson | 6 | $3,624,975 |
| Jason Brown[iii] | 3 | $3,508,652 |
| Chad Thompson | 11 | $2,328,054 |
| Jaylin Goss | 8 | $2,274,649 |
| Nestor Velazquez | 4 | $1,526,986 |
| Noelle Trimble | 13 | $1,272,978 |
| Michael Angel Martin | 5 | $1,268,550 |
| Chyna Bethley | 5 | $1,082,743 |
| De'el & Quiana Woods | 7 | $692,761 |
| Tia Bolden | 17 | $272,581 |
|  | **Median Number of Deceptive Earnings Claims Reported: 7** | **TOTAL: $249,529,714** |

[i] Chyna Bethley: PX25, 2725-93 (2nd Tyndall Dec. ¶6, Att. A); Tia Bolden: PX25, 2709, 2794-3060 (2nd Tyndall Dec. ¶7, Att. B); Brandon Boyd: PX25, 2709, 3061-09 (2nd Tyndall Dec. ¶8, Att. C); Jason Brown: PX25, 2709, 3110-30 (2nd Tyndall Dec. ¶9, Att. D); Austin Godsey: PX25, 2710, 3131-3272 (2nd Tyndall Dec. ¶10, Att. E); Jaylin Goss: PX25, 2710, 3273-3386 (2nd Tyndall Dec. ¶11, Att. F); David Imonitie: PX25, 2710, 3387-3484 (2nd Tyndall Dec. ¶12, Att. G); Julian Kuschner: PX25, 2710, 3485-3546 (2nd Tyndall Dec. ¶13, Att. H); Darwin Lopez: PX25, 2710-11, 3547-3717 (2nd Tyndall Dec. ¶14, Att. I); Michael Angel Martin: PX25, 2711, 3718-60 (2nd Tyndall Dec. ¶15, Att. J); Alex Morton: PX25, 2711, 3761-83, 6730-33 (2nd Tyndall Dec. ¶16, Atts. K, Z); PX17, 921, 986, 1047-48, 1068-70, 1124, 1128-30, 1133-42, 1191-1205, 1207-12, 1218-46 (1st Patten Dec., Atts. B, N, P, S-V); PX18, 1250-64, 1360-63, 1375-79, 1381-86, 1397-1413, 1425-34, 1436-37, 1439-49 (2nd Patten Dec., Att. A-E); PX19, 1474-93, 1547-65, 1579-97, 1779-80 (3rd Patten Dec., Att. A-C, L-N, Q, R, UU); PX4,119-20, 146 (Gonzalez Dec. ¶17, Att. G); German Castelo Muzquiz: PX25, 2711, 3784-3881 (2nd Tyndall Dec. ¶17, Att. L); Garrett Roberts: PX25, 2711, 3882-4003 (2nd Tyndall Dec. ¶18, Att. M); Matt Rosa: PX25, 2711, 4004-47 (2nd Tyndall Dec. ¶19, Att. N); Joshua Stewart: PX25, 2711-12, 4048-73 (2nd Tyndall Dec., ¶20, Att. O); Ivan Tapia: PX25, 2712, 4074-4104 (2nd Tyndall Dec. ¶21, Att. P); Branden Thompson: PX25, 2712, 4172-4202 (2nd Tyndall Dec. ¶23, Att. R); Bryce Thompson: PX25, 2712, 4203-58 (2nd Tyndall Dec. ¶24, Att. S); Chad Thompson: PX25, 2712-13, 4259-4374 (2nd Tyndall Dec. ¶25, Att. T); Noelle Trimble: PX25, 2713, 4375-4461 (2nd Tyndall Dec. ¶26, Att. U); Nestor Velazquez: PX25, 2713, 4462-96 (2nd Tyndall Dec. ¶27, Att. V); De'el & Quiana Woods: PX25, 2713, 4497-4519 (2nd Tyndall Dec. ¶28, Att. W).

[ii] PX20, 1806 (Violette Dec. ¶20); PX21, 1843 (Agarwal Dec. ¶10); PX25, 4545-46, 6742 (2nd Tyndall Dec., Atts. X, Z) (Brandon Boyd Interrogatory No. 5 Resp.).

[iii] Jason Brown has held two IBO positions—one with GDN and the other individually.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that on May 30, 2025, **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** was electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Ernest D. Figueroa
Lucas J. Tucker
Samantha B. Feeley
State of Nevada, Office of Attorney General
Bureau of Consumer Protection
8945 W. Russell Road, #204
Las Vegas, NV 89148
efigueroa@ag.nv.gov
ltucker@ag.nv.gov
sfeeley@ag.ny.gov


Alina Veneziano
Oberheiden, P.C.
440 Louisiana Street, Suite 200
Houston, TX 77002
alina@federal-lawyer.com
*Attorney for Defendant Alex Morton*


Phillip Silvestri
Greenspoon Marder, LLP
3993 Howard Hughes Parkway, Suite 400
Las Vegas, NV 89159
philip.silvestri@gmlaw.com
*Attorney for Global Dynasty Network, LLC, Jason Brown, and Matthew Rosa*

Lars K. Evensen
Holland & Hart LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
lkevensen@hollandhart.com

P. Sterling Kerr
Kerr Simpson Attorneys at Law
2900 W. Horizon Ridge Parkway, Suite 200
Henderson, NV 89052
sterling@kerrsimpsonlaw.com

*Attorneys for International Markets Live, Inc., IM Mastery Academy Ltd., Assiduous, Inc., Christopher Terry, and Isis Terry*

Z. Ryan Pahnke
Ray Quinney & Nebeker P.C.
36 South State Street, Suite 1400
Salt Lake City, UT 84111
rpahnke@rqn.com
*Attorney for Brandon Boyd*


                              */s/ Laura C. Basford*
Attorney for Plaintiff Federal Trade Commission