Crane Pomerantz, Esq.
Nevada Bar No. 14103
CLARK HILL PLLC
1700 South Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135
Telephone: (702) 697-7545
Facsimile: (702) 862-8400
cpomerantz@clarkhill.com

Logan D. Smith (*Pro Hac Vice*)
lsmith@mcnamarallp.com
MCNAMARA SMITH LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 269-0400
Facsimile: (619) 269-0401
*Attorneys for Court-Appointed Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION and STATE OF NEVADA,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>INTERNATIONAL MARKETS LIVE, INC., et al.,<br><br>　　　　　　Defendants. | Case No. 2:25-cv-00760-CDS-NJK<br><br>**RECEIVER'S INTERIM STATUS REPORT** |

Court-appointed receiver Thomas McNamara ("Receiver") respectfully presents this Interim Status Report pursuant to the Court's November 4, 2025 Order to provide an update on the status of tasks required by the Third Modified Preliminary Injunction. *See* ECF No. 188. This report builds upon, and incorporates by reference, the Receiver's reports and filings, *see* ECF Nos. 140, 163, 169 & 175,[1] and focuses on receivership tasks since November 4, 2025.

## I.    Immediate Access to Properties

On Thursday, November 6, 2025, the Receiver and counsel accessed the following premises of the Terrys in the United States: 1) the Mount Kisco, New York estate; 2) the Sunny Isles Beach, Florida condominium; 3) the Miami, Florida condominium; and 4) the Feathertree house in Henderson, Nevada (which was purchased and is controlled by Chris Terry but titled via his girlfriend, Keishia McLeod).

Immediate access into the Terrys' properties was planned to occur as soon as possible after the issuance of the Court's Order on November 5, 2025 naming Mr. McNamara as a receiver on a permanent basis. We coordinated notification and entry among the locations on the same day in an effort to thwart the removal of assets. Although outreach to local law enforcement agencies was done, in the end, we were able to gain access by working with defense counsel. The Terrys were cooperative and compliant in permitting access to all of the properties after notice was given to their counsel in the morning on Thursday, November 6, 2025. Around 8:30 a.m. (PT) that day, we contacted Lars Evensen, counsel for the Terrys, to inform him of our plan to immediately access the Terrys' properties in Mount Kisco, Henderson, and South Florida, with the assistance of local police should the required cooperation not be provided. Mr. Evensen indicated that he would be back in touch after contacting his clients.

---

[1] At the hearing on October 21, 2025, the Court granted the Plaintiffs' motion to convert the Monitorship to a Temporary Receivership over the Corporate Defendants, Monitored Entities, and the Individual Defendants (*see* ECF Nos. 167 & 170), and on October 28, 2025, the Court entered the written Second Modified Preliminary Injunction setting forth the specific duties and obligations of the Temporary Receiver. *See* ECF No. 171. Up until the Plaintiffs' motion to convert was granted, the Temporary Receiver had served as Monitor by virtue of his appointment by the Court in the August 11 and August 18 Preliminary Injunction Orders. *See* ECF Nos. 104 & 111. In that capacity, the Receiver presented a Preliminary Report on October 6, 2025. *See* ECF No. 140. Supplemental reports were filed on October 20 (*see* ECF No. 163) and on October 28 (*see* ECF No. 175).

### A.    Mount Kisco, New York Property

At around 9:00 a.m. (PT) (Noon (ET)), the Receiver contacted the Terry's personal counsel George Kelesis to let him know he was outside of the Mount Kisco home and had contacted the local police to accompany him into the residence.  The Receiver asked Mr. Kelesis to coordinate with whomever was in the house to allow entrance.  Mr. Kelesis indicated he would try to do so.

A short time later, Ms. Terry opened the gated entry and waved us in.  She initially refused to identify herself or speak even when the Receiver indicated her attorney, Mr. Kelesis, who was on the phone with the Receiver, wished to speak with her.  A short time later, Ms. Terry left the house once her attorney informed her of the requirement to do so.

The house is extremely large (more than 12,000 square feet), with four floors, including the basement, and sits on roughly 11 acres of land.  It was furnished spartanly, and it appeared that only one person is presently living in the house.  The house was well kept and clean.  None of the furniture looked particularly high-end.  The closet in the master bedroom contained very few clothes, particularly given the size and scope of the closet, and none of the contents were luxury brands we know that Ms. Terry purchases.  We took video and photos of the entire house and investigated its contents as described below.[2]

There were seven cars onsite.  These included two older cars, a BMW, a Mercedes, and newer vehicles in the garage, a Bentley, a Rolls Royce, and a Range Rover, and another Range Rover parked in front of the house.  Ms. Terry drove off in a Jeep Wrangler Rubicon.

In what appeared to be Ms. Terry's office on the main floor, there were three, four-drawer file cabinets with a substantial amount of documents contained in hanging and manila folders.  Some of the documents went back more than 20 years and contained detailed information about employment, financial condition, and living situations.  Ms. Terry is a prolific notetaker and appears to save all her receipts.  In the process of reviewing the twelve file

---

[2] There was also a pool house, a pool house basement, and a storage barn.  Nothing of importance or relevance was found in those locations.

drawers, we identified a number of hanging folders and manila folders with relevant documents, which the Receiver took from the premises for copying.

In reviewing those materials, we found substantial handwritten notes by Ms. Terry confirming that there are several items of personal property, including jewelry, that Ms. Terry has not disclosed on the personal financial disclosures that she has submitted to us and the Plaintiffs under oath. In the attic, there were many storage bins containing empty luxury goods boxes, including dozens of empty Gucci boxes. Separately, we later found an entire box of luxury item hang tags, most with the prices (often several thousand dollars) included. *See* **Exhibit 1**. While we located the boxes and hang tags, we did not initially locate the items.

There was one locked room in the basement for which we asked for the key. Ultimately, Ms. Terry returned to the property and threw the key near the front gate for our retrieval. The key opened what is a wine cellar. But that room is being used to store Ms. Terry's luxury purchases, which appear to have been consolidated there. We do not know the reason why Ms. Terry put all of these items in one place. There were dozens of women's designer clothes inside hanging bags. There were dozens of pairs of luxury designer shoes. There were dozens of luxury designer bags. We videotaped and took pictures of many of these items.

While these items were purchased for thousands of dollars each, and as a group, it seems likely the items were purchased for hundreds of thousands of dollars, we decided not to remove the items. We later received the express commitment from the Terrys through their counsel that they would not remove the items pending further instruction. *See* **Exhibit 2.**

There was a safe inside the wine cellar. At our request, the code was provided by defense counsel. Inside the safe were several watches and jewelry items. It also included the engagement ring that we knew about by virtue of our review of emails and which was discussed at length with Ms. Terry in her deposition and subsequently added to her financial disclosures. But the safe did not include the number of watches and other jewelry items we expected to be onsite, based on our investigation and the hang tags, invoices, and notes of Ms. Terry we found onsite. The documentary evidence suggests there are many luxury watches and jewelry that are located somewhere else and have never been disclosed. We took an inventory of the modest

number of jewelry items we discovered, including the engagement ring, for safekeeping.  *See* **Exhibit 3**.

In the process of reviewing documents in Ms. Terry's office, we located a new application for a safe deposit box dated August 27, 2025.  *See* **Exhibit 4**.  It appears that Isis Terry along with her brother Frank Gomez (who lives in Florida) jointly opened a safe deposit box at the Mount Kisco Wells Fargo branch at that time – just two weeks after the entry of the preliminary injunction.  When completing her financial disclosures under penalty of perjury in this case, Ms. Terry indicated "none" when asked whether she had a safe deposit box.  We do not know if Ms. Terry ever used this safe deposit box.  Our office immediately let Wells Fargo know that no access should be given to that box.[3]

Our review continued until just about 7:00 p.m.  We did not take any of the clothing items.  However, the email we sent subsequently to the Terrys' counsel let them know that we had identified numerous items worth more than a $1,000 and made clear that the Terrys were under Court order not to give, sell, or otherwise dispose of these assets.  *See* **Exhibit 2**.  We then spoke with their counsel and specifically obtained the agreement and assurance from Mr. Terry and Ms. Terry that they would not touch these items for the time being.

**B.**    **2297 Feathertree Ave., Henderson, NV 89052 (*Held in the Name of QCS1, LLC*)**

Around 10:00 a.m. (PT), the Receiver's counsel gained access to the Feathertree house located in Henderson, Nevada.  This house is titled in the name of entity QCS1, LLC ("QCS"), which lists Keishia McLeod as the sole member; however, it was purchased with IML proceeds and prior to entry, we understood that this house was Mr. Terry's primary residence and he lived there with his girlfriend Ms. McLeod.  We therefore had earlier named QCS as a Receivership Entity.  We have also been in communication with Ms. McLeod's separate counsel in this case; as discussed more below, her counsel has been slow to respond but otherwise cordial, while

---

[3] On December 4, 2025, we secured access to the Wells Fargo safe deposit box, and it was empty.

indicating that Ms. McLeod has taken the indefensible position that everything purchased by Mr. Terry (the house, jewelry, luxury clothes, and cars) belongs to her as "gifts" from Mr. Terry.

The Receiver's counsel was accompanied into the Feathertree subdivision, a gated community, by uniformed officers of the Henderson Police Department.  Mr. Terry and Ms. McLeod were present upon arrival.  Both were cooperative, granted counsel entry, and left when requested to do so.  The local police officers remained near the site while counsel was present, but their assistance was not necessary.

Upon arrival, there were six vehicles located outside of the property behind a gated driveway, and there was another vehicle located inside the garage.  In addition to these, Ms. McLeod and Mr. Terry drove off in an electric blue Lamborghini.  The vehicles included: a 2021 Cadillac Escalade; a 2019 Rolls Royce "Dawn"; a 1963 Chevrolet Impala; a black Convertible Ferrari; a 2021 Mecedes Benz Maybach S Class 580; a 2016 Lamborghini Huracan LP 601 4; a 2020 Jeep Wrangler Unlimited Rubicon; and a 2017 Ferrari Convertible 2D 488 Spider Convertible (located in garage along with a golf cart).  In our discussions with Ms. McLeod's counsel, we also understand there is a Porsche titled in Ms. McLeod's name that was purchased with IML funds and is a Receivership Estate Asset.

The house itself was very large (approximately 11,388 square feet).  In the entrance foyer, there was a baby grand piano as well as a crystal chandelier hanging from the second floor.  On the first floor, there was a lounge room with a leopard rug, a large screen television, a sofa, and a professional massage chair.  There was also a two-story dressing room with closets on both floors.  The bottom story appeared to have an area for men's clothing, hats, and shoes that were located inside glass/wood cabinets.  On top of the dresser were numerous pairs of high-end sunglasses, designer bags, and scarves.  Also located on the bottom story were clothing racks with designer women's clothing and shoes.  Many of these items cost more than a thousand dollars; while we did not take any of these items into our possession, they are subject to the Parties' agreement that the Terrys are not to dispose of them absent notice to the Receiver.

A stairway led to a landing area with cabinets and shelving containing designer purses, jewelry, a tiara, iPhones, and air pods.  This landing area also held a clothing rack with women's

designer clothes.  There were many empty designer clothes boxes.  This landing led to yet another dressing area which held women's luxury gowns, clothing, leisure wear, and business clothes.  There were also two open safes on the landing that did not appear to contain assets. (They were either never used or were emptied prior to our arrival.)

The primary bedroom contained a massage table, a large screen television, and a Power Plate lymphatic system.  On a desk in the bedroom were pharmaceuticals, including steroids (testosterone).  On the four bar stools adjacent to the bar, there were 10 designer purses while designer sunglasses (Versace, Gucci, etc.) sat on the counter.  On the bar area were portable batteries for electronics, two iPhones, and three Bittium devices (which provide secure communications and often cost over ten thousand dollars).

The kitchen included a walk-in refrigerator, numerous high-end appliances, a water purifier system, seven blenders, and five high-end knife sets in wood cases.  There also was a cold-plunge pool and a room for monitoring eight surveillance cameras.  The three-car garage contained the Ferrari, a golf cart, large screen televisions, an electronic safe (unopened), and numerous storage boxes with framed photographs, office supplies, tables, and cleaning equipment.

On the second floor, there was a professional conference room with a large table, chairs, whiteboards, a smart board with an attached camera, and a large screen television.  There was yet another closet attached to this room that contained designer clothing for men.  There was also another bedroom, an upstairs kitchen, a fitness room, a laundry room, and a meditation room.  Of note, we identified upstairs fitness equipment, men's business wear, and women's gowns, which were items over the $1,000 threshold identified in the Preliminary Injunction as Receivership Property and thus subject to the Parties' agreement that the Terrys will not dispose of such materials without prior approval from the Receiver.[4]

---

[4] There were approximately 30 suit jackets, 36 suit and dress pants, 50 scarves, and designer sport jackets; the gym equipment included a Nordic Track stationary bike, Vectra leg press, Power Plate standing lymphatic machine, Nordic Track stair stepper, Life Fitness Stair stepper, Nordic Track Treadmill, Nordic Track recumbent bike, Nordic Track multiple angle pulley system, Vectra 3 station standing exercise/weight machine, Smith Press, weight bench, and free weights.

The basement contained an expansive recording studio, consisting of three rooms. The first room was the recording studio control room (with a sound board, a mixing board, outboard effects, monitor speakers, keyboards, and a large monitor with a glass window that viewed the live room); the second room was the "live" room, containing amps, guitars, and other string instruments, chairs, tables, lighting equipment, smart boards, camera equipment, and microphones; and the third room contained percussion equipment and a large screen television. The were numerous items here above the $1,000 threshold.

### C.    The Sunny Isles Beach, Florida Condominium (Acqualina)

Counsel for the Receiver gained access to the Sunny Isles property around approximately 1:30 p.m. (ET). It is a luxury condominium of 3,854 square feet and located on the 35th floor of one of the Acqualina buildings in Sunnys Isles Beach, Florida. Property management was very cooperative and had reviewed the copy of the PI previously sent by the Receiver's office establishing a freeze on assets.

Prior to  the immediate access, the Terrys had moved personal contents out of the Sunny Isles property. It is not known how much was kept there previously, but property management reported the condo had other contents the last time they were in the unit, which was less than two months earlier when Ms. Terry was last living there.[5] The condo appeared to be fastidiously maintained, and there were no personal belongings of note still in the unit. There were limited items, such as blenders, kitchen utensils, and the like. The only items of note to be found were titles to the two cars, which we secured. We took pictures and video of the condominium, but since it was essentially empty, except for furniture, this process went quickly.

Prior to leaving we secured the property, changed the locks, and instructed property management that no one be given access without permission from the Receiver. We were also informed that the Terrys were delinquent regarding several months of HOA fees on this property.

We also inspected the two cars, a Rolls Royce and a Range Rover which were parked in the building. We gave instructions that these two cars should be secured at that location in the

---

[5] At the time of Ms. Terry's deposition on September 30, 2025, she was living in Florida.

building's long-term underground storage and no access should be given without the Receiver's approval.

As discussed in more detail below, we have now taken steps to list this property for sale.[6]

**D.**    **The Miami Florida Condominium (One Paraiso)**

Counsel gained access in the late afternoon (approximately 3:30 p.m. (ET)) to the Terrys' One Paraiso penthouse unit in Miami. They purchased this unit in the fall of 2024, after several years of a lease-to-buy agreement. (Thus, all of the prior payments by the Terrys under that arrangement went towards the purchase price of this unit). Property management was cooperative and familiar with the PI, which had been provided the prior week. According to the manager, the Terrys themselves had never occupied this property even when the lease-to-buy agreement was in place. The property manager was familiar with Ms. Terry, and he had interacted with her more than with Mr. Terry. He indicated that he had also limited discussions with the attorney involved in the property. When we asked whether that was Mr. Kerr, he said yes.

The manager opened the unit, and counsel inspected and reviewed its contents. The unit had no power when we entered because the Terrys had failed to pay the electricity bill. According to the property manager, there was therefore a risk of mold because the air conditioning unit could not be run. Shortly after learning this (the next day), we contacted the utility company and established an account and got the power turned back on to mitigate this risk.

The Terrys were also more than 60 days behind in paying their HOA fees on this property. The property manager also pointed out that the Terrys had failed to care and maintain the deck for the elevated hot tub on the very large outdoor balcony, which meant that there could be some repairs that would be needed.

---

[6] We have settled on a listing price range of between $9,850,000 and $10,250,000. We provided notice of our intent to list to defense counsel and offered to discuss; we have not had a response on this issue.

We had the locks changed and instructed management that no one was to be given access without the Receiver's permission.  We located set of car keys to a Chevy Suburban, which is parked and secured in the building's garage.

The manager told us that the Terrys had listed the unit for rent this year, but that it had not rented.  It appears that the unit was also listed for sale earlier this year.

Much like the Sunny Isles Acqualina condo, the Terrys kept the condo furnished, and it also had few to no personal belongings, apart from a few stray personal items, such as a pair of $750 Gucci shoes.  As with the Terrys' other apartment, there were several empty bags for luxury brands, though not as many located here.  There was also some mail for that address directed to Frank Gomez, Ms. Terry's brother, suggesting that he at one time had lived there or at least used it as a mailing address.

As to both Florida condos, they are well positioned to be marketed for sale.  We have entered a listing agreement with a real estate broker for the Acqualina unit (it will be on the market next week); we have also worked with the broker to establish a listing price for the One Paraiso unit, but given it does not have a mortgage, we are analyzing whether renting the property makes sense.[7]  It has been a priority to list the Acqualina property for sale, because it is encumbered by a massive mortgage obligation in excess of $50,000 a month and five million dollars in total.  We hope to sell the unit during the Miami market's high season (over the winter into spring).

We have paid the outstanding balances owed to the HOAs for both Florida properties and intend to remain current as to both.  As both buildings are managed by professional property managers, the condos are safely protected with all of the contents secure.

### E.    One At Palm Jumeirah Property (Dubai)

On Monday, November 10, 2025, at around approximately 9:00 p.m. (Dubai time/9:00 a.m. (PT)), the Receiver contacted counsel for the Terrys to inform him that the Receiver and his counsel were requesting immediate access to the two properties located in Dubai (known as One at Palm condo and the Bulgari condo).  The following morning, at about 10:00 a.m. (Dubai

---

[7] We have held preliminary discussions with one prospective tenant.

time), the Receiver and counsel entered the One Palm property with the permission of, and cooperation from, the Terrys.  The Terrys put us in touch with their house manager in Dubai. The house manager was cooperative and confirmed that the Terrys had not recently been in Dubai and that no one had occupied either unit (the One Palm or the Bulgari property) since a visit by Ms. Terry, which ended in January of 2025; he also confirmed that no contents had been removed from the two units.  He indicated that he had moved certain items from the Bulgari unit to the One Palm property over the summer when it was contemplated that the Bulgari unit would be rented.

The Dubai house manager indicated that the Terrys had hired him three years ago (November of 2022) to manage the properties, which had largely remained vacant except during the Terrys' limited visits to Dubai.  He indicated that he had more interaction with Ms. Terry, but he had also communicated with Mr. Terry via WhatsApp.

The house manager explained that Ms. Terry had been in Dubai a total three times since he was hired: November of 2022 until January of 2023; January 2024 to March 2024; and August of 2024 until January of 2025.  Mr. Terry was only present during the first visit in late 2022.  At present, the house manager indicated that he was the only person located in Dubai that was currently being paid by the Terrys (although the last pay was in early September); when Ms. Terry visited Dubai, she brought with her two bodyguards and a chef, and she hired a local driver.

The Terrys purchased the One Palm property during its construction, and the unit served as a sales model.  The One Palm property had very few items of Ms. Terry's clothing.  There were numerous empty boxes and bags for designer clothing.  Ms. Terry, according to the house manager, always brought her clothes with her and then departed with them.  The condo did have one portion of the closet full of Mr. Terry's clothing; the items of clothing there were Versace designer shirts and matching shorts, each of which was purchased for more than a thousand U.S. dollars.  Most of the Versace items appeared to never have been worn and immediately below where they hung was a full drawer of clothing hang tags, apparently for the items in the closet. *See* **Exhibit 5**.

Mr. Terry had called the house manager on the day prior to our visit asking him to take photos of the contents of both units. As it turns out, the house manager had photographed the units recently and so he just sent those photos to Mr. Terry. In September of 2025, the Terrys stopped paying the house manager. But they offered a compromise. In violation of the asset freeze in place, the Terrys told the house manager that he could sell Chris Terry's Versace clothes back to Versace as compensation. He went to a Versace store in Dubai to inquire; he was told that the Versace store needed to speak with one of the Terrys before purchasing any of the clothes back. The Terrys apparently never followed up with Versace. Thus, none of these clothes have been sold.

The house manager informed us that the furniture came with the unit at the time of the Terrys' purchase, as the condo was staged as a sales unit by the building. The other contents of note were contained in the safe. We were able to open the safe based on the code provided by defense counsel. The top shelf contained keys to both condos, a necklace and head piece, an envelope with ADIB statements, and two Vanuatuan passports. There was no indication that the passports had been used for travel, although we have seen indications that the passports were used in connection with an effort to move IML business out of the U.S. to Dubai.

The bottom shelf of the safe contained papers. These included documents relating to car purchases, including indications that $2.7 million was paid for a Rolls Royce and a 2020 Dutch hypercar; according to the house manager, by time he was hired by the Terrys in November of 2022, they did not have the hypercar.

There were also numerous documents relating to the efforts to obtain passports from Vanuata. These confirmed that securing non-U.S. passports for more than half a million dollars from a foreign country was not a casual thing done by the Terrys; rather, the process involved many steps – this evidence provides further indications that Ms. Terry's answers under oath that she did not recall the details about obtaining such passports were not credible. We also found other documents in the safe about the Terrys' plans to restructure IML. At the time of finding them, we were already aware of the Terrys' concerted efforts to move the IML business outside of the United States; these documents provide further confirmation of the Terrys' efforts to save

11

the IML business in the event that the FTC sought to shut down the business.  The Terrys' plan is far too complicated to describe and doing so is well beyond the scope of this report.  For present purposes, we note that the intended plans we saw are consistent with the other efforts by the Terrys over the past couple of years to move assets out of the reach of U.S. regulators and further confirm that the Terrys were taking steps on numerous fronts to intentionally divert or hide their assets through a variety of means.

It does not appear that the Terrys were successful in setting up Dubai operations for IML-related entities.[8]  But they did take steps to do so, including purchasing and funding several Dubai-based shelf companies and leasing office space.  The goal appears to have been securing Dubai-based payment processors willing to work with the Terrys.  It does not appear, based on what we saw, that the Terrys were ever able to secure payment processing for their Dubai-based business.

We inspected three vehicles in the One Palm garage downstairs, a Rolls Royce, Range Rover, and a Toyota (for staff), all of which remain secure.

### F.    The Bulgari Condominium (Dubai)

Following our inspection of the One Palm property, we travelled with the house manager to the second property located at the Bulgari development, which is in a separate part of Dubai. The manager confirmed that this property was never occupied by the Terrys but had been purchased as an investment property.  The Bulgari property is a 2,398 square foot condominium, purchased in 2019.  It had staged furniture in it and presently contains no personal belongings. There was a locked safe, which we were unable to access.  We agreed that we would speak with the Terrys' counsel and have the house manager attempt to re-open the safe at a later date.

The house manager confirmed that no one occupied the Bulgari property, which has been vacant for years.  He moved over certain items (mostly accessory decorative items) from this condo to the One Palm property when the Terrys thought they had successfully rented it under an

---

[8] It appears, based on notes we reviewed, efforts to move companies, assets, and revenues to Dubai were discussed and initially implemented in 2022, 2023, and 2024.  But it also appears that efforts were never fully executed.

annual lease last August.  He confirmed his understanding that the lessee backed out of the lease at the last minute.

There were no vehicles at this unit.  As with the One Palm property, we confirmed that the property manager would only deal with the Receiver going forward and would not permit the Terrys or anyone else at their behest to have access to the Bulgari property.

As discussed below, both of the Dubai properties are in a condition to be sold immediately.

**G.    The Waldorf Condominium in Las Vegas, Nevada**

Also, on November 10, 2025, counsel inspected the condominium at the Waldorf Las Vegas and secured the premises.  A member of the Receiver's team had previously entered this unit in August, as it was identified as an IML business address in the initial PI.  The computer onsite at the time was imaged.  Counsel indicated that while the condo was furnished and there were indications that people had lived or stayed there (*e.g.*, clothes, dishes, etc.) in the past, there did not appear to be anyone presently occupying it.  There were no cars located at this address.  The Receiver has also confirmed with property management that the Terrys will no longer have access absent approval from the Receiver.

The Waldorf is subject to a $2.253 million mortgage and is presently several months in arrears.  As such, the Receiver made the listing of this unit for sale a priority.  After speaking with brokers, the Receiver entered a listing agreement with a broker who has sold more than 80 units in the building.  The listing price is $3,495,000.  We gave notice to defense counsel of our intent to list, the listing price, and offered to discuss.  We have received no response.  The listing was activated late last week and has received an initial offer.[9]

**H.    New York, NY Condominium**

The Terrys, via Auspicious Trust, own a Manhattan condominium on West 57th Street. This property has no debt and is currently being rented under an annual lease, which is due to

_____

[9] The Receiver has also been contacted by counsel for the lender holding the mortgage, who understands that a stay from this Court is in place, presently preventing any foreclosure proceedings absent this Court lifting the stay.  Counsel indicated that the lender would otherwise be pursuing its legal rights.  We discussed with counsel our mutual understanding that there should be sufficient value in the condominium for its sale to pay off the mortgage.

expire early next year.  We spoke with the real estate agent who rented property to the current tenant, and we have also now spoken with the tenant directly, who has been paying $35,000 per month (going to $37,500 in January).  The tenant indicated his intent to likely vacate the premises at the end of March.  We are still evaluating whether to rent the property again or list it for sale at that time.  The preliminary view is that it would be preferable to sell the condominium in 2026.

## I.     Waldorf Condominium (Miami, Florida) – Unbuilt

The Terrys entered into a purchase agreement for a condominium under construction at a Waldorf Astoria-branded building in Miami.  Approximately $1.696 million has already been paid towards the purchase of this unit, and there are additional payments well in excess of $5.4 million that will be due as the building reaches various milestones and is ultimately completed. The Receiver has been in discussions with attorney Lou Montello in Florida (who manages the Harmonic Waves yacht, discussed elsewhere in this report) about ways to maximize the value of this investment, where there has been only partial performance on the contract.

## II.    Investment Land in Henderson, Nevada

There are numerous investment properties located in the MacDonald Highlands planned community in Henderson, Nevada.  All of these properties are undeveloped vacant land purchased by the Terrys.  These lots are owned and controlled by the Terrys through the following entities: Dominant Consulting Group, LLC (Auspicious Trust) (13 lots); Cityview Ridge LLC (1 lot); and St. Croix LLC (1 lot).

Three of the lots are encumbered by the same mortgage obligation of approximately $3.39 million, which was entered into with a hard money lender named Ignite Capital.  That loan is in default.  We do not know the reasons why this loan was made in the first instance, but the Receivership Estate is encumbered by this debt obligation nevertheless.

The Receiver has listed three of the lots for sale.  We have received offers to purchase the three listed lots as well as offers to purchase several of the lots that have not been listed for sale. In several instances, the offers were too low to warrant counteroffers; in a few instances, the Receiver has made counteroffers.  To date, the Receiver has not accepted any of the offers.

### III.    Payment of Outstanding HOA Obligations

There was a familiar pattern among all of the above-listed properties.  Since the closing of IML and the Court's order imposing a PI, the Terrys have stopped paying the monthly HOA fees and were several months in default.  In our discussions with property managers and attorneys representing these HOAs, several of them indicated that they had been planning to bring legal proceedings given that the Terrys were in default based on their failure to pay, but they are now aware the stay of proceedings issued by the Court in the PI prevented such actions.

The Receiver has, nevertheless, now cured the default and paid the outstanding HOA amounts.  This was particularly important with respect to the two Dubai properties, because these assets are not located in the United States, and based on conversations with Dubai counsel, it is unlikely that Dubai courts would recognize this Court's stay of actions Order.

### IV.    Next Steps with Dubai Properties

Prior to traveling to Dubai, the Receiver contacted counsel there with expertise in international government investigations.  This was necessary to ensure that immediate access was handled consistent with Dubai law and to identify available next steps once the assets had been safeguarded.

While in Dubai, we met with counsel in person to discuss the alternatives and next steps for the One Palm and Bulgari properties; in particular, we discussed what must be done to comply with Dubai law under these circumstances where the properties are Receivership Estate Assets but are titled in the individual names of Chris and Isis Terry.  Dubai counsel advised that the Terrys could fulfill their cooperation obligations under the PI and their repatriation obligations by taking all necessary steps under Dubai law to sign a Power of Attorney ("POA") authorizing the Receiver to market and sell the real estate as well as the automobiles and other assets of the Terrys located in Dubai.  This process will require the Terrys to provide fulsome cooperation in several forms, including appearing virtually before a notary public.  As discussed below, on December 8, 2025, the Terrys indicated they would cooperate by taking the first step of executing the POAs.

While in Dubai, the Receiver and counsel also met with a real estate broker who has sold many of the units in the Bulgari development.  He provided an overall market assessment and insights into the Dubai real estate market and the optimal timing of the sales.  In general, he indicated that it would be advantageous to list the properties for sale as soon as possible as Dubai is entering its busy season; he also indicated that these two properties, which have no mortgages on them, have substantial value, and in support of that position, he provided a history of recent sales in both buildings.  He was confident that both could be sold well within a year of listing and likely far sooner.

Since returning from Dubai, the Receiver engaged the Dubai law firm (Hadef & Partners) to serve as counsel in Dubai.  Dubai counsel has prepared and provided POAs for the Terrys to enable the Receiver to market and sell the Dubai assets.  On November 26, 2025, the Receiver sent that to the Terrys' defense counsel and asked for the Terrys to sign the POAs enabling this process to being as soon as possible.  After reviewing the matter with their counsel, the Terrys have now agreed to sign the POAs.[10]

Under the PI, the Receiver has broad authority to take steps to protect Receivership Estate Assets, including selling these international properties.[11]  The PI in this case also contains specific provisions that require the Terrys to repatriate assets located in Dubai.  *See* Sections VIII & VIII of the PI.  The Terrys have been required to repatriate their Dubai assets since August of

[10] In an initial response, counsel for the Terrys initially argued that he did not believe that the Third Modified PI (ECF No. 188) granted the Receiver the authority to sell property, real or personal; however, after meeting and conferring with the Receiver and his counsel on December 5, 2025, the Terrys and counsel revisited this position and agreed to sign the POAs.

As background, the Receiver had given counsel for the Terrys a deadline of close of business, December 8, 2025 to inform the Receiver whether the Terrys would cooperate and sign the POAs, and whether the Terrys more generally were going to challenge the Receiver's authority to market and sell properties under the Preliminary Injunction.  The Receiver indicated that absent immediate cooperation, the Receiver would bring a motion before the Court to compel.  On December 8, 2025, after speaking with his clients, counsel informed the Receiver that the Terrys would sign the POAs, and the Terrys have since then taken meaningful steps to do so, including agreeing to meet with the Dubai-based Notary Public.

[11] The PI includes the standard and uncontroversial language used when Courts appoint equity receivers in regulatory actions brought by federal agencies like the FTC, SEC, and CFPB.  The language unambiguously authorizes the Receiver to sell the Properties to preserve the value of the assets in the Estate (the Receiver has previously relied on similar authority in other cases to sell dozens of properties).  *See generally* ECF No. 188 Section XXIII (A)-(D).

this year but have not done so.  The Terrys have also not previously presented a list under oath of all of their foreign assets, as required under the PI, much less a plan for repatriating such assets.

The Terrys are presently violating the PI (and have since August) on numerous fronts (asset disclosures, naming of third parties with assets, etc.), and their failure to repatriate assets has remained a compliance failure.  The Receiver's proposal to sell the properties with the Terrys' cooperation to take all necessary steps to allow the Receiver to control the process for selling the properties will enable the Terrys to come into compliance as to repatriation of assets and remedy this aspect of non-compliance.

After being informed that the Terrys would sign the POAs, the Receiver immediately contacted Dubai counsel and scheduled appointments with the Dubai Notary Public for December 9, 2025 at 9:00 p.m. (Dubai time/9:00 a.m. PT).  The Terrys responded promptly that that they were available to execute the POAs on that schedule.  Because of logistical issues, however, which we believe have now been addressed, the appointment with the Notary had to rescheduled for tomorrow, December 10, 2025.

As the Court is well aware, the Terrys have engaged in a pattern of non-compliance in this case and have failed to satisfy numerous PI requirements.  These actions were in addition to their efforts to hide assets and put them out of reach of the Receivership Estate (the most vivid examples of this include the machinations with the Auspicious Trust, the "gifts" to Mr. Terry's live-in girlfriend, and the failed effort to move $9 million overseas in May 2025 after the FTC's lawsuit with a dubious cryptocurrency investment).  That said, the Receiver notes that the Terrys' cooperation in the repatriation of foreign assets offers the Terrys a meaningful opportunity to turn a new leaf.

## V.     Texas Cryptocurrency Lawsuit

The Receiver has been working with outside counsel to pursue the recovery of the $9 million "investment" where Chris Terry sought to move funds in May of 2025 outside of the U.S. in a cryptocurrency investment.  Fortunately, before any money had been moved out of the country, Bank of America froze $8 million.  A lawsuit was brought to recover those funds, as well as the additional million dollars that was sent out of Auspicious Trust funds.

The lawsuit, which was filed by outside counsel prior to implementation of the Receivership, seeks recovery of those funds. Based on what counsel has indicated, Bank of America may deposit the funds into the registry of the court where the lawsuit was filed or file an interpleader action. The Receiver is still seeking to find the most efficient way to return the funds to the Receivership Estate and avoid protracted litigation relating to the return of such funds. The Receiver is evaluating the best path, with advice from counsel based in Texas pursuing the case. The Receiver may still seek an order from the Court to expedite this process, but the matter is still under review.

## VI.    Harmonic Waves Yacht

While in Florida, counsel met with Florida counsel Lou Montello, who was previously engaged by the Terrys to manage the yacht for a monthly fee. The yacht was purchased for $3.75 million in December of 2021 but is likely worth substantially less than that amount in its present condition and continues to incur substantial monthly costs. The Receiver is presently seeking to sell the yacht and continues to evaluate options, assisted by Florida counsel's recommendations.

Mr. Montello and counsel inspected the yacht, and Mr. Montello pointed out various expenditures he believed necessary for the vessel. As detailed in previous reports to the Court, the yacht has substantial outstanding and recurring expenses: past due and ongoing fees owed to the captain; past due and ongoing dockage fees; and past due fees owed to Mr. Montello. While Mr. Montello has agreed to defer payment of his fees until the boat is sold, he advised that the Receiver must develop a plan to come current for dockage and captain's fees, because of the unique rights under maritime law that risked confiscation of the boat by the marina and the need to maintain a captain as a precondition to boat insurance. The Receiver has begun to pay off the past due amount as well as pay the monthly expenses that continue to accrue.

In addition, there are several expenses that will likely be required before the boat can be sold, including perhaps engine repairs. While in Florida, Mr. Montello showed counsel several estimates for boat repairs ranging between $400,000 and $600,000. The receiver is presently evaluating the options but remains very concerned about sinking money and time into the vessel

without a clear understanding that it will be beneficial to the estate. While the need to maintain and make essential repairs is apparent, it is not clear here that it would be appropriate to spend hundreds of thousands of dollars in the hopes it will be recaptured upon a sale. Any such expenditures are fraught with complication and risk, and the Receiver is mindful of the quip about yachts that Mr. Montello told the Receiver and counsel in their introductory call that, "A boat is a hole in the middle of the ocean into which you throw money."

## VII.    Payment of Defendants' Living Expenses and Defense Counsel's Legal Fees

When serving as Monitor/Temporary Receiver, the Receiver negotiated with counsel for the Terrys to authorize both Chris Terry and Isis Terry to receive personal expenses up to $75,000 out of the bank account located in Dubai (the ADIB account), which they disclosed. The Terrys have now drawn down those funds. During that same time period, the Receiver also reviewed the request by the Terrys' counsel to be paid for its work billed in August 2025. Based on that review, the Monitor/Temporary Receiver recommended that counsel be paid (roughly $90,000).

Going forward under the operative PI now in effect (ECF No. 188), the Receiver does not have the authority and is not empowered to negotiate payment of living expenses or review requests for payment of legal expenses. The Receiver has so informed counsel for the Terrys, who understand that any future living expenses or requests for legal fees are matters that should be negotiated with the Plaintiffs, with ultimate authority to decide these matters vested with this Court.

## VIII.   Keishia McLeod

After naming QCS1 as a Receivership Entity on October 25, 2025, the Receiver reached out to counsel for Ms. McLeod about his client's obligations under the PI and the duties of the Receiver to identify and preserve QCS1's assets. The most significant asset of QCS1/Ms. McLeod is the Henderson Nevada house "owned" on paper by QCS1, but controlled by Mr. Terry, which is discussed above; however, based on our investigation, review of documents, and the inventory of assets located at the Feathertree house, Ms. McLeod received hundreds of thousands of dollars of IML proceeds in the form of jewelry, clothing, and automobiles titled in

her name.  It is abundantly clear that Ms. Terry was increasingly using his girlfriend Ms.

McLeod to be a front, and he directly involved her in his efforts to divert assets.  *See*, *e.g.*, ECF

No. 163-15 at 5-6 & 10-11 (Texts from Mr. Terry to Ms. McLeod: "Protects assets nobody can

touch lol  Why do u feel I have office Realesate is protected  Why fla. Homestead why Vegas

homestead  Is reasons ur sa[f]e  fla Vegas  Daddy planned for u…  Assett protection for uFla and

Vegas Only two places on US  Can do that  Daddy got u alw[a]ys.").

     In discussions with Ms. McLeod's counsel, while he has agreed that Ms. McLeod will

not dispose of the assets that were paid for by Chris Terry out of IML proceeds but put in her

name, counsel for Ms. McLeod has nevertheless recently taken positions, indicating that Ms.

McLeod is refusing to turnover assets belonging to the Receivership Estate.  Specifically, her

counsel has written the Receiver as follows:

> Ms. McLeod's automobiles and jewelry are not owned or controlled by Chris
> Terry.  Her 1963 Impala was a gift received from Chris Terry in June 2022.  Her
> Lamborghini Huracan was a gift from Chris Terry in October 2020.  She also
> owns a black Porsche convertible (not a Ferrari) which was a gift from Chris
> Terry in July 2020.  Regarding Ms. McLeod's jewelry, the tiara was a gift from
> Chris Terry in August 2021.  Ms. McLeod's position is that her automobiles,
> jewelry, and Feathertree home are not owned or controlled by Chris Terry – all
> were gifts to her.[12]

---

[12] Additionally, Ms. McLeod's counsel similarly wrote Plaintiffs' counsel that:

> I conferred with Ms. McLeod regarding the most recent Modified Preliminary
> Injunction and the notices directed to herself, Analusion and QSC1.  Ms. McLeod
> and her LLCs are not in active concert or participation with any of the defendants,
> including Chris Terry, in relation to the FTC case and defendants' frozen assets.
> She and the LLCs have not held, controlled, or maintained custody, of assets
> owned or controlled, directly or indirectly, by any Defendant; held, in part or in
> whole, for the benefit of any Defendant; in the actual or constructive possession
> of any Defendant; or owned or controlled by, in the actual or constructive
> possession of, or otherwise held for the benefit of, any corporation, partnership,
> asset protection trust, or other entity that is directly or indirectly owned, managed
> or controlled by any Defendant, including Chris Terry.  With regard to QSC1, Ms.
> McLeod disagrees with Tom McNamara's determination that Chris Terry controls
> QSC1 and the Feathertree property and that she is a front owner.  Ms. McLeod
> owns and controls QSC1 and the Feathertree property.  However, Ms. McLeod
> recognizes that QSC1 has been deemed a monitored entity and will treat QSC1
> (and it's only asset, Feathertree property) as a frozen asset pending a
> determination by the court.  With regard to Analusion, she intends to use that
> LLC, which she owns, to operate a business going forward which has nothing to
> do with Chris Terry.  All Analusion has is an overdrawn bank account.  The
> business which will operate out of her Analusion LLC is developing an app which
> will provide users a unique perspective on personal growth integrating meditation,
> music, qi gong and community.  With regards to gifts that Ms. McLeod received

20

**Exhibit 6**.  Ms. McLeod's assertion that these were "gifts" is tantamount to refusing to comply with her court-ordered obligations under the PI, which include cooperating and non-interference with the Receiver.  Given Ms. McLeod's position, the Receiver will likely be forced to seek relief from the Court to gain control of the numerous assets titled in her name.

**IX.    Sterling Kerr/Auspicious Trust**

As indicated to the Court when responding to Mr. Kerr's request for fees, the Receiver has not been able to obtain substantial cooperation from Mr. Kerr.  While Mr. Kerr has produced some documents to the Receiver, his cooperation remains partial and grudging.  Of particular importance, he has failed to produce his communications with the Terrys and has not provided a privilege log identifying any valid basis for withholding documents.  While the Receiver has sent numerous emails and letters to Mr. Kerr's counsel attempting to coax cooperation from Mr. Kerr, this has ultimately been a largely fruitless exercise.  Thus, it will likely be necessary to seek relief from this Court to compel Mr. Kerr's compliance with several requirements under the PI.

**X.    Summary of Assets and Estimated Current Value of Assets, As of December 9, 2025**

Lastly, we attach our best assessment of the identity and value of known assets in the Receivership Estate, which was prepared primarily by our forensic accountant, Lisa Jones. *See* **Exhibit 8**.  The identification and valuation of assets are provided with numerous caveats for many reasons.  First, our investigation continues, so more assets are likely to be identified. Second, there are notable categories of assets not identified on the list, including transfers to third parties.  We are aware that Mr. Terry regularly bought luxury automobiles, jewelry, and clothing, and secured housing for a multitude of third parties, including family and friends.  This included millions of dollars spent on his live-in girlfriend, Ms. McLeod, but extended well beyond her to other women.  But we do not have the required sworn disclosures from either of the Terrys identifying financial transfers to third parties which makes this exercise more

---

from Chris Terry, Ms. McLeod has informed Tom McNamara that her automobiles (Impala, Lamborghini, Porshe), jewelry and the Feathertree property are not owned or controlled by Chris Terry and are hers alone.  However, Ms. McLeod will treat those assets as frozen pending a determination by the court.

**Exhibit 7**.

challenging.  Identifying and valuing Receivership Estate assets held by third parties is beyond the scope of this report.

We also note that the prevalent use by Mr. Terry of cryptocurrency over many years has made the exercise of identifying what they did with IML proceeds more complicated.  Additionally, as discussed more below, we have not specifically included on the chart substantial personal property (luxury clothing, jewelry, etc.), which was purchased for hundreds of thousands, if not millions, of dollars.

With those caveats, we offers our present best estimate of the value of the primary assets, which consist largely of real property and personal property (primarily automobiles).

*Real Property*

The real property in the Receivership consists of fifteen lots of vacant land (all located in MacDonald Highlands), eight residential properties (located in Nevada (2), New York (2), Florida (2), and Dubai (2)), and one contract to purchase residential property under construction in Florida.  *See* **Exhibit 8** at 2.  For purposes of our estimate, the real properties have been valued at their purchase price in the attached valuation.  The contract to purchase the Florida residential property under construction has been valued at the total amount of the deposits made as of January 29, 2025.  The purchase price of the real properties totals $67,003,256.

The market value of each property will vary based on several factors, such as the real estate market conditions, property specifics, and external influences.  In some cases, we are confident that the property can be sold at a higher valuation, while in others, we are less certain.

There are liens with principal amounts on three of the vacant land properties and on three of the residential properties.  These total $13,323,535 and are growing (interest, default fees, etc.).  Interest and fees will continue to accrue on the principal amounts outstanding.

Even though the stay prevents foreclosure on these properties, the obligations remain and continue to accrue each month.  As discussed elsewhere, we have listed for sale the three vacant lots (active), the Waldorf Las Vegas (active), and the Acqualina unit (in process), which have mortgages.  Ms. Terry is presently living in the Mount Kisco property, which incurs a mortgage cost of more than $24,000 a month (based on a $2.273 million mortgage).  She has failed to

make several mortgage payments, and counsel has indicated she is not in a position to pay the mortgage. Ultimately, this arrangement is not sustainable, and it is likely that we will have to list this property for sale in early 2026; in the meantime, we will continue to discuss the matter with the Ms. Terry's counsel and the Plaintiffs.

*Personal Property*

The personal property identified in the attached chart consist largely of vehicles. *See id.* at 3-4. A luxury auto auction broker reviewed the list of twenty-one vehicles, and, in his opinion, estimated the value of the aggregate lot of vehicles to be between $1,400,000 to $1,700,000. Please note that this was a preliminary valuation, without close inspection of any of the vehicles.

There are two yachts among the personal property assets. *See id.* at 5. There is a 50% interest owned for one of the yachts, while the other is wholly owned by Harmonic Waves, LLC. The purchase of the 50% interest totaled $280,000, and the value of interest is estimated to be the same amount. The purchase price of yacht owned by Harmonic Waves, LLC totaled $3,750,000; however, the yacht is in poor condition and costly repairs are needed. The estimated actual value of the yacht is far lower than the purchase price.

The Terrys also own four personal seat licenses for the Las Vegas Raiders, which were purchased in 2021 for a total of $970,000. *See id.*

A diamond ring with a purchase price of $1,925,000 is also among the personal property assets. *See id.* The market value of the ring will vary based on market conditions and was appraised by the Terrys for insurance purposes to be worth $2.87 million. We have taken possession of this ring.

Please note that other than the diamond ring, for which we know the specific purchase price, other personal property – namely luxury clothing items, jewelry, furniture, high-end gym equipment, designer handbags, shoes, and scarves, Bittium phones, and other personal property – has not been included on the current estimated value of assets. We have also taken possession of only a limited amount of other jewelry and watches located at the Mount Kisco house; however,

23

we are confident that the defendants have not identified and we have not located or taken possession of the majority of the Terrys' jewelry, which we believe they spent millions on.[13]

In addition to jewelry, we have evidence that the Terrys spent hundreds of thousands of dollars on clothing, shoes, and the like.  These items were identified and photographed during our immediate access.  As noted above, we reached agreement with counsel for the Terrys that while we would leave the other items of personal property for the time being found in their homes (*e.g.*, luxury clothing, shoes, furniture, etc.), the Terrys have agreed that those assets all remain subject to the asset freeze, and the Terrys specifically agreed not to sell or otherwise dispose of those items without approval of the Receiver.  *See* **Exhibit 2**.

As indicated on the attached chart, the balances frozen in the accounts of the Receivership Entities and the Terrys total $4,295,586, of which $4,175,623 was transferred to the Receivership Estate bank account.  *See id.* at 6.[14]

The ongoing maintenance and preservation expenses of the real and personal property assets will continue to be costly.  For example, the combined mortgage payments of the three residential properties are $100,706 per month, HOA fees are more than $37,000, property taxes are significant, and real property insurance expenses are material.

## XI.  CONCLUSION

The Receiver looks forward to addressing these topics and answering the Court's questions at the January 7, 2026 hearing.

Dated: December 9, 2025                          MCNAMARA SMITH LLP


                                                 By:   /s/ Logan D. Smith
                                                     Logan D. Smith (*Pro Hac Vice*)
                                                     655 West Broadway, Suite 900
                                                     San Diego, California 92101
                                                     lsmith@mcnamarallp.com

---

[13] Despite the Terrys' agreement to honor the asset freeze and their cooperation during immediate access, we are not confident that we have gained possession of the majority of their jewelry.  Their disclosures remain deficient in identifying their purchases of jewelry for themselves and for third parties.

[14] Some of these funds have since been used to pay the first Court-approved fee application, HOA fees, insurance premiums, and costs associated with the Harmonic Waves yacht, etc.

Crane Pomerantz
Nevada Bar No. 14103
CLARK HILL PLLC
1700 S. Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135
cpomerantz@clarkhill.com

*Attorneys for Court-Appointed Receiver,*
*Thomas W. McNamara*

## **CERTIFICATE OF SERVICE**

I certify that on this 9th day of December, 2025, I served via CM/ECF a true and correct copy of the foregoing **RECEIVER'S INTERIM STATUS REPORT** via electronic service by operation of the Court's electronic filing system, upon each party in this case who is registered as an electronic case filing user with the Clerk.


  /s/ Logan D. Smith
Logan D. Smith
*Attorneys for the Court-Appointed Monitor,*
*Thomas W. McNamara*

1