Crane Pomerantz, Esq.
Nevada Bar No. 14103
CLARK HILL PLLC
1700 South Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135
Telephone: (702) 697-7545
cpomerantz@clarkhill.com

Logan D. Smith (*Pro Hac Vice*)
lsmith@mcnamarallp.com
MCNAMARA SMITH LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 269-0400
*Attorneys for Court-Appointed Receiver,
Thomas W. McNamara*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION and STATE OF NEVADA,<br><br>Plaintiffs,<br><br>v.<br><br>INTERNATIONAL MARKETS LIVE, INC., et al.,<br><br>Defendants. | Case No. 2:25-cv-00760-CDS-CJA<br><br>**RECEIVER'S SUPPLEMENT TO DECEMBER 9, 2025 INTERIM STATUS REPORT** |

Court-appointed receiver Thomas McNamara ("Receiver") respectfully presents this Supplement in advance of the January 23, 2026 status conference to provide an update on recent developments since the time of the Receiver's December 9, 2025 Interim Status Report (ECF No. 212). The Receiver also wishes to identify issues likely to be brought before the Court in the coming days and to seek guidance and direction from the Court.

## I. Automobiles Belonging to the Terrys

The Receiver has now taken possession of most of the automobiles titled in the Terrys' name or in the name of their entities. This includes: six vehicles located in Mt. Kisco, New York; and four cars located at the Henderson, Nevada property. There are also three cars secured at the Florida condominiums, and three cars located at one of the Dubai condominiums.

A luxury automobile expert and auctioneer has been consulted to value the cars and to present a proposal to market and sell the cars through direct sales or an auction process this winter and spring.[1] The Terrys have retained a Jeep in Mt. Kisco and another Jeep in Henderson for their use.

Despite our requests, the vehicles collected do NOT include four vehicles located at the Feathertree house in Henderson, which are titled in the name of Mr. Terry's live-in girlfriend, Keishia McLeod. Ms. McLeod claims through her counsel that these cars were "gifts" from Chris Terry to her and therefore not part of the receivership estate. In fact, these vehicles were titled in Ms. McLeod's name as part of Chris Terry's misguided "asset protection" strategy. We have identified numerous text messages between Chris Terry and Ms. McLeod in which he emphatically states he owns the cars and the Feathertree house (which is titled in QCS1, LLC, an entity placed in Ms. McLeod's name). In light of this evidence, the refusal to turn the cars over violates the Preliminary Injunction. We will be forced to file a motion on this issue shortly.

## II. Dubai Properties

The Terrys have now executed Powers Of Attorney (POAs), drafted by the Receiver's Dubai counsel, which empower the Receiver to control the two Dubai condominiums. After

---

[1] Once the proposed terms are finalized, the Receiver will bring a motion to approve the engagement and the sales process.

1

discussions with several real estate agents in Dubai, the Receiver engaged a real estate agent at Christie's in Dubai, who has actively marketed the two condominiums for sale. There have been several showings on the properties as well as offers made on one of the properties. To date, the Receiver has not accepted an offer.

If the Receiver is able to reach agreement on the purchase price of one of the condominiums, the Receiver's standard practice is to make the sale contingent upon this Court's review and approval.

### III.   Florida Condominiums

The two condominiums located in the Miami area, one titled in Isis Terry's name and the other in the name of a Receivership Entity, the Auspicious Trust, are listed for sale. To date, no offers have been received.

### IV.   Las Vegas Condominium

The Waldorf condominium titled jointly in the names of Isis de La Torre (her maiden name) and Chris Terry was listed for sale by the Receiver in early December. This week, the Receiver accepted an offer to purchase the condominium for $3.4 million, subject to Court approval (the original listing price was $3.495 million). The buyer is still in the due diligence period and so the sale terms are not final. This property has a mortgage of approximately $2.25 million (approximately $21,000 per month) associated with it, which the Receiver expects to negotiate paying with sales proceeds. Once the due diligence is completed, the buyer intends to pay all cash and is seeking an expedited closing and we will seek the Court's approval.

### V.   MacDonald Highlands Lot

As indicated in the prior report, there are 16 undeveloped lots owned by Receivership Entities in the MacDonald Highlands planned community in Henderson, Nevada. Three of the lots are encumbered by hard money loan obligations totaling $3.39 million (the "Ignite loans").

The Receiver listed the three encumbered lots for sale through a broker in late October. Several offers were received and rejected because they were substantially below the listing prices. For more than two months, the Receiver negotiated with a proposed buyer for one of the three lots, Lot 17. After numerous counteroffer exchanges, the parties agreed to a purchase price

2

of $3,850,000 for Lot 17, subject to Court approval.  The buyer is still in the due diligence period.  If the buyer intends to move forward after the diligence period, the Receiver will seek the Court's approval and point towards a late February close.  The sales proceeds will be used to pay off the Ignite loan of $780,000 associated with the lot.

## VI.     Court Approval Procedure for Real Property Sales

At the January 23 hearing, the Receiver would like to propose and discuss with the Court a process to handle the approval of real estate transactions, especially where transactions may require expedited consideration.  For instance, the Receiver is presently engaged in negotiations with one all-cash offer, which may require a very short period within which to close the transaction.  While the Receiver recognizes that is not an "emergency" and is reluctant to overuse the *ex parte* motion process, the Receiver also wants to safeguard the assets of the Receivership Estate and ensure that maximum sale prices are achieved.  The Receiver is also mindful to provide all interested parties with an opportunity to object to such motions and the Court with sufficient time to rule on these motions as well.

The Receiver proposes filing motions to approve the real estate transactions on the following timeline:  The Receiver will file a motion to approve a real estate sale and provide all parties with notice, each of whom will then have the opportunity to object within 10 days to the proposed sale, after which point the motion will be ripe for the Court's review.  Should the Receiver require an expedited decision from the Court to satisfy a particular contractual obligation (*e.g.*, a short window to close), the Receiver will identify that date for the Court in the motion.  Should the Receiver seek an even more truncated timetable in light of particular circumstances (*e.g.*, a deal will be lost if not closed within a week), he will file a motion on an *ex parte* basis stating the reason for the expedited process, but that will only take place if the unique circumstances require it.

The Receiver believes that this process affords all interested parties with sufficient due process and falls well within this Court's exercise of its broad discretion to supervise and administer an equity receivership.  *See, e.g.*, *SEC v. Hardy*, 803 F.2d 1034, 1037-38 (9th Cir. 1986) ("[A] district court's power to supervise an equity receivership and to determine the

3

appropriate action to be taken in the administration of the receivership is extremely broad.");
*SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978 ("[I]t is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership."); *cf. Hardy*, 803 F.2d at 1038, 1040 (noting federal district courts may "make rules which are practicable as well as equitable," including approving the use of summary procedures in the context of the administering distribution of receivership assets).

### VII.   Mt. Kisco Property

The Receiver has been in active discussions with counsel for the Terrys about the need to market and sell the Mt. Kisco estate, where Ms. Terry is currently residing. That property, which was purchased for $3.7 million and includes a 12,000 square foot house on multiple acres, has a mortgage obligation of approximately $2.27 million (approximately $25,000 a month) and substantial monthly upkeep requirements. Despite the fact that she has continued to reside in the property since this case was filed, Ms. Terry has not made the mortgage payments (or any payment towards the mortgage). We understand from counsel that she is not in a position to make the mortgage payments. There are also concerns about the lack of upkeep at the property, which will dissipate the value and equity in the property.

The Receiver has raised this concern with defense counsel on several occasions. The reality is that Ms. Terry cannot continue to reside on the property during the pendency of the case, if she cannot pay the mortgage and maintain the property. Counsel for Ms. Terry proposed that she move to the New York condominium, which was purchased for $8.535 million and is not encumbered by a mortgage. At present, the condominium is rented at $37,500 per month. Even if the tenants vacate, it is extraordinarily expensive (either in lost rent or sale proceeds) to have Ms. Terry reside in a condominium worth approximately $8 million. The Receiver does not believe that Ms. Terry is in a financial position to pay the monthly rent.

In addition, the Receiver will also need to list and market the Feathertree house where Mr. Terry is residing with Ms. McLeod. That has been less pressing only because there is no mortgage on that property; however, the status quo cannot be maintained, and this too will need to be addressed. As noted above, the added complication here is that, despite the undisputed fact

that Chris Terry resides in and paid for the house through IML proceeds (and unequivocally claims ownership in text communications with Ms. McLeod and others), the Feathertree house has been titled in Ms. McLeod's name through the entity QCS1, LLC.

The Receiver named QCS1, LLC a Receivership Entity on October 25, 2025. Ms. McLeod's counsel was immediately provided notice of the determination, invited to provide additional information, and informed that Ms. McLeod could challenge the determination with the Court. *See* PI, ECF No. 188, at 23, Section XIII(U) ("Duties and Authorities of Receiver") ("If the Receiver identifies a nonparty entity as a Receivership Entity, promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the court.")

Ms. McLeod has not challenged the Receivership Entity determination in almost three months. As such, the Receiver has full authority to sell the property.

Under the PI, Ms. Terry and Mr. Terry are both permitted to continue to reside in their "Primary Personal Residences," but that is conditioned upon assets being maintained and preserved. The PI states that: "absent approval from this court, the Receiver may not evict Individual Defendants from their respective Primary Personal Residences unless they are taking steps to hide, dissipate, destroy, or abscond with assets or Documents within the Receivership Estate." ECF No. 188 at 21. The inability to service the mortgage payments on the Mt. Kisco Property and otherwise maintain it constitutes a dissipation of assets. The Receiver has nevertheless proceeded cautiously on this issue and has attempted to work with Ms. Terry for a resolution. Similarly, Mr. Terry is not maintaining the Feathertree property, HOA fees have not been paid (resulting in a threat to foreclose from HOA counsel) and real estate taxes are delinquent by more than one year and total $34,237.04 as of today.

The status quo cannot continue. If no resolution is reached in the next two weeks on the Mt. Kisco property, the Receiver will return to the Court seeking an order that Ms. Terry leave the Mt. Kisco premises, so that the property can be sold or rented.[2] Likewise, if Mr. Terry cannot maintain the Feathertree property, it too must be sold or rented.

---

[2] As noted in the December 9, 2025 Status Report, the Receiver identified numerous items (luxury clothing, shoes, and handbags) at the Mt. Kisco and Feathertree locations, which were

5

**VIII. Harmonic Waves Yacht**

The Receiver has reached a deal in principle to sell the yacht for $1.27 million.[3] Prior to doing so, the Receiver engaged in extensive efforts to determine the market value and to decide whether to make additional repairs in an effort to obtain a higher price.[4] The Receiver worked closely with maritime lawyer, Louis Montello, who managed the vessel for the Defendants. He has counseled in favor of accepting the offer.[5] The Receiver also had the yacht inspected by two brokers, both of whom identified hundreds of thousands of dollars in repairs which are necessary to properly market and sell the vessel. While the repairs could result in a higher listing and sale price, there is also a substantial risk that the cost could exceed one million dollars, and it will take months for the repairs to be completed with substantial monthly carrying costs.[6]

While the sale price is substantially below the purchase price, there were far too many risks here, given the massive monthly carrying costs of roughly $50,000 (dockage fees, captain's fees, etc.), as well as the hundreds of thousands of dollars in necessary repairs, which would have led to an additional six-plus months of delay before the yacht could be marketed for sale.

---

likely to be worth more than $1,000 – and which certainly cost more than $1,000 when purchased. Under the PI, these are assets belonging to the Receivership Estate.

Mr. Terry and Ms. Terry have confirmed her agreement through counsel not to dispose of any assets above the $1,000 threshold that are located at Mt. Kisco or Feathertree. Based upon that express understanding and agreement, the Receiver has not taken those items into his possession; however, should the Court order Ms. Terry to vacate the Mt. Kisco premises or Mr. Terry and Ms. McLeod to vacate the Feathertree property, the Receiver will coordinate with counsel to arrange for such items to be taken into the Receiver's control.

[3] The proposed buyer is conducting diligence on the vessel now.

[4] Also, before accepting, the Receiver informed counsel for the Terrys of the proposed sale and invited him to speak directly with Mr. Montello about the terms of the proposed sale and the reasons Mr. Montello recommended accepting the offer.

[5] Among other things, Mr. Montello indicated that there were other challenges to selling this particular yacht (a Mangusta which had only three staterooms) and that it was his opinion based on talking with several people in the industry that the market for Mangusta yachts has crashed. The other options Mr. Montello provided were a charity donation, which does not work in a receivership, or an auction; however, he dismissed the idea of an auction, given that it required a full survey of the yacht, he was told a recent auction for a Mangusta did not have the minimum bid, and approximately 25% of auctions fail.

[6] Without repairs, one of the brokers believed the vessel was worth $1 million as it sits.

### IX. Texas Cryptocurrency Lawsuit

The Receiver's team has continued to work with outside counsel to pursue the recovery of the $9 million Chris Terry sought to move outside of the U.S. in May of 2025 as part of a cryptocurrency "investment." The Receiver and counsel have had discussions with two of the people directly involved in this failed investment, as well as with counsel for Bank of America, which froze $8 million of the funds. The Receiver's counsel is working closely with counsel for Bank of America in an effort to provide the bank with whatever documentation it needs to transfer the frozen funds to the Receivership Estate. The bank, as a third party financial institution with no stake in this case, is understandably cautious before releasing such a large amount of funds to the Receiver. While the Receiver is attempting to resolve this issue without this Court's intervention, it is possible that the bank will require a Court Order (separate from the Preliminary Injunction) to turn over the funds that have been frozen. If so, the Receiver will return to the Court to make this request.

### X. Sterling Kerr/Auspicious Trust

Mr. Kerr remains out of compliance with his obligations under the PI, given that (as noted in the December 9, 2025 Report) he has not produced his communications directly with the Terrys and has not provided a privilege log identifying any valid basis for withholding documents. Counsel for the Receiver raised this non-compliance with Mr. Kerr's counsel in an effort to narrow the dispute; however, no progress has been made. Thus, absent a change in his position, the Receiver will be forced to bring an OSC contempt motion to compel compliance.

### XI. Conclusion

The Receiver looks forward to addressing these topics and answering the Court's questions at the January 23, 2026 hearing.

Dated: January 22, 2026                    MCNAMARA SMITH LLP

By: /s/ Logan D. Smith
Logan D. Smith (*Pro Hac Vice*)
655 West Broadway, Suite 900
San Diego, California 92101
lsmith@mcnamarallp.com

7

Crane Pomerantz
Nevada Bar No. 14103
CLARK HILL PLLC
1700 S. Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135
cpomerantz@clarkhill.com

*Attorneys for Court-Appointed Receiver,
Thomas W. McNamara*

8

# CERTIFICATE OF SERVICE

I certify that on this 22nd day of January, 2026, I served via CM/ECF a true and correct copy of the foregoing **RECEIVER'S SUPPLEMENT TO DECEMBER 9, 2025 INTERIM STATUS REPORT** via electronic service by operation of the Court's electronic filing system, upon each party in this case who is registered as an electronic case filing user with the Clerk.

  /s/ Logan D. Smith
Logan D. Smith
*Attorneys for the Court-Appointed Receiver,*
*Thomas W. McNamara*